

▮▮▮▮▮▮▮▮▮▮▮▮   PUBLIC VERSION

Fish & Richardson P.C.
222 Delaware Avenue
17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114

302 652 5070 main
302 652 0607 fax

July 16, 2015

The Honorable Leonard P. Stark
J. Caleb Boggs Federal Building
United States District Court
844 N. King Street
Wilmington, DE 19801

Christopher A. Winter
cwinter@fr.com
302-778-8442

Re:   *Yodlee, Inc. v. Plaid Technologies Inc.*
      Case No. 1:14-cv-01445-LPS-CJB

Dear Chief Judge Stark:

**Introduction**:

This discovery dispute arises in a patent litigation between two companies that each operate specialized data servers and software infrastructure designed to collect, summarize, and categorize financial account information maintained at major financial institutions (with the permission of the account holders). The accused products, Plaid's "Auth" and "Connect" services are not generally sold to end-users but rather are sold to software developers who create smartphone apps and websites. Plaid makes these services available to these developers through an "Application Programming Interface" or "API." The API specifies how the developer's application will connect to Plaid's servers, how the application will make requests to Plaid for its servers to collect account information, and how the application will receive the collected information from Plaid.

This background is essential context for the discovery dispute at issue. Yodlee seeks the Court's assistance to compel Plaid to produce "core technical documents . . . sufficient to show how the accused products work" as required by the Court's Scheduling Order. (D.I. 26 at ¶ 7(b).)

On May 20, 2015, Yodlee served its identification of accused products and specifically identified Plaid's Connect and Auth products as infringing.[1] (Ex. A at 2.) In turn, on June 4, 2015, Plaid was required to produce "core technical documents . . . sufficient to show how the accused products work." (D.I. 26 at ¶ 7(b).) However, Plaid limited its production to documents describing the API made available to developers and failed to produce technical documents describing in detail how Plaid's data servers operate after receiving requests for information through the API. In short, Plaid produced information akin to user manuals, without producing technical documentation describing the internal operation of the accused products.

Yodlee promptly raised this issue to Plaid's counsel, particularly noting that Plaid's deficient production prejudiced Yodlee in preparing its initial infringement contentions and narrowing the

---

[1] This is not a case where there is any ambiguity as to the accused products or functionality. Plaid only has two products—Connect and Auth—which both have narrow and specific functionality and which Yodlee has explicitly accused of infringement. (Ex. A at 2.) Indeed, Plaid does not appear to argue that Yodlee's identification of Connect and Auth was deficient ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

fr.com

The Honorable Leonard P. Stark
July 16, 2015

asserted claims. (Ex. B.) The parties met and conferred in accordance with the local rules, and then jointly sought a telephonic hearing on the issue. (D.I. 43.) Yodlee requested that the hearing be scheduled to take place before the deadline for Yodlee to complete its initial infringement contentions. (*Id.*)

On July 15, 2015, Yodlee served its initial infringement contentions regarding each of the seven patents-in-suit. Significantly, as part of its initial infringement contentions, Yodlee was required to elect 49 claims out of the 162 claims in the seven patents-in-suit. Yodlee made this election without the benefit of a full production of "core technical documents" by Plaid, even though the schedule set by Magistrate Judge Burke contemplated that this initial election of claims would take place after Yodlee had been able to analyze the core technical documents.

**Description of Specific Deficiencies in Plaid's Production**:

As noted above, Plaid's production does not show in detail "how" Plaid's Connect or Auth products work. Plaid's production consists of: (1) publicly available print-outs from its own website; (2) print-outs from Plaid's publicly available GitHub page; and (3) a single eight page "confidential" document. These documents are intended for developers and merely describe the routines and protocols necessary for accessing and using Plaid's API from the customer perspective. These documents lack detailed information about how the Plaid Auth and Connect products operate internally. Specifically lacking from Plaid's production are documents sufficient to show specifically how the Connect and Auth products collect user data from websites, format and/or convert user data, and categorize user transaction data.

For instance, Plaid's production from GitHub is focused on assisting developers in understanding and using Plaid's API. Indeed, Plaid has confirmed that the production from its GitHub site merely "provide[s] hundreds of pages of code for *operating Plaid's APIs*, support discussions between Plaid and its users, suggestions from Plaid on *how to use the API*, explanations on *how the API works*, and other technical material." (Ex. C at 2 (emphasis added).) These documents provide information relevant to developers writing applications designed to use the Plaid API but do not explain in detail how the Plaid servers (and the software operating on those servers) respond to the requests received through the API, the detailed mechanism used by Plaid's servers to interact with third party financial institution websites to collect account data, or the detailed mechanism by which the Plaid servers assemble the data to return to users through the API.

[redacted]

**Plaid Should Be Compelled To Produce Documents Showing How Connect And Auth Work**:

In light of Yodlee's clear identification of Plaid's Connect and Auth as accused products, Plaid should have produced documents sufficient to show in detail how these products work including how these products collect user data from websites, format and/or convert user data, and categorize user transaction data.

The Honorable Leonard P. Stark
July 16, 2015

During the meet and confer process, Plaid informed Yodlee that it lacks technical documentation, other than source code, that would provide this information. While an accused infringer in a software case does not necessarily have to produce source code to satisfy the "core technical documents" requirement, the accused infringer must produce documents "sufficient to show how" the accused products operate. If the only documentation available to show "how" the accused products operate is source code, then the accused infringer must indeed produce source code.

Contrary to Plaid's position, there is no blanket exception in the Scheduling Order or Delaware rules releasing an accused infringer from producing documents "sufficient to show how" the accused products work just because the necessary documents happen to be source code. Paragraph 7(b) of the Scheduling Order requires production of "core technical documents . . . *sufficient to show how the accused product(s) work(s), including but not limited to* non-publicly available operation manuals, product literature, related to the accused product(s), sufficient to show how the accused product(s) work(s), *including but not limited to* non-publicly available operation manuals, product literature." This language is open-ended and does not release Plaid from producing any particular category of documentation.

While Yodlee recognizes that source code is particularly sensitive and confidential, the parties negotiated a Stipulated Protective Order which includes more than seven pages expressly detailing the manner in which source code shall be produced. (D.I. 27 at 9-16.) This Protective Order was entered by the Court on May 13 – three weeks *before* Plaid's deadline for producing core technical documents. Thus, confidentiality concerns do not provide a basis for excusing Plaid from its obligation to provide a complete production of core technical documents.

Yodlee was prejudiced by having to narrow the asserted claims without the benefit of full and complete technical documentation showing how Plaid's Connect and Auth products work. The purpose of Yodlee receiving Plaid's core technical documents *before* the first narrowing was to provide Yodlee a basis to select what it views to be the strongest claims for assertion. *Cf. Tech. Licensing Corp. v. Blackmagic Design Pty Ltd.*, C.A. No. 13-05184-SBA(MEJ), 2015 WL 307256, at *4-5 (N.D. Cal. Jan. 22, 2015) (ordering reduction of asserted claims only after plaintiff received discovery regarding defendant's products); *Fleming v. Cobra Elecs. Corp.*, C.A. No. 12-392-BLW, 2013 WL 1760273, at *3 (D. Idaho Apr. 24, 2013) ("discovery has just begun, and it would be unfair to require [the plaintiff] to choose representative claims at this stage of the litigation").

Indeed, as noted in Yodlee's infringement contentions, Yodlee determined that more than 49 claims are infringed by Plaid based on the information available to date, but Yodlee nonetheless limited its initial infringement contentions to 49 claims as required by the Scheduling Order. If Yodlee had received a full and complete production of core technical documents, Yodlee may have selected different claims to comprise the universe of 49 elected claims. Plaid's failure to sufficiently produce core technical documents, thus, has denied Yodlee the ability to shape this case as it sees fit.

For these reasons, Yodlee respectfully requests that the Court: (1) compel Plaid to produce documentation showing how Plaid's Connect and Auth products work including, if necessary, producing its source code; and (2) provide Yodlee leave to amend its initial infringement contentions, including amending its election of 49 claims, after reviewing Plaid's supplemental production.


**FISH.**
FISH & RICHARDSON

The Honorable Leonard P. Stark
July 16, 2015

Respectfully,

*/s/ Christopher A. Winter*

Christopher A. Winter

Enclosures

cc: Counsel of Record (w/enclosures via email)