
| | |
|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  PUBLIC VERSION | Fish & Richardson P.C.<br>222 Delaware Avenue<br>17th Floor<br>P.O. Box 1114<br>Wilmington, DE 19899-1114<br>302 652 5070 main<br>302 652 0607 fax |

July 17, 2015

The Honorable Leonard P. Stark
J. Caleb Boggs Federal Building
United States District Court
844 N. King Street
Wilmington, DE 19801

Christopher A. Winter
cwinter@fr.com
302-778-8442

Re: *Yodlee, Inc. v. Plaid Technologies Inc.*
Case No. 1:14-cv-01445-LPS-CJB

Dear Chief Judge Stark:

We write in response to Plaid's letter regarding the alleged deficiencies in Yodlee's identification of accused products.

Plaid's contentions that the accused products are somehow unclear or that Yodlee has "shift[ed] [its] obligation to identify specific products onto Plaid" stretch credibility. (D.I. 47 at 2.) Plaid is a 20 employee startup that publicly offers *only two products*—Connect and Auth.[1] (*See, e.g.*, D.I. 31 at 2-3.) For instance, Plaid's website includes a "Product" navigation header that lists *only* "Auth" and "Connect." Plaid, https://www.plaid.com. As even Plaid must admit, Yodlee *specifically identified these two products* as infringing all seven of the patents-in-suit. (*See* D.I. 47 at 1.) Thus, there is no ambiguity in accused products and Yodlee has not shifted any obligation to Plaid. Yodlee has specifically identified Plaid's Connect and Auth products as infringing. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

But Plaid's discovery dispute is not about Yodlee's identification of accused products. Instead, it is a belated attempt to justify Plaid's improper refusal to produce core technical documents for its Connect and Auth products and an end-run around Judge Burke's order that "a schedule be set and imposed" while Plaid's motion to stay is decided. (Ex. B at 123:15-16.)

On May 20, 2015, Yodlee specifically identified Plaid's only two products using the same identifying names as Plaid uses in selling its products—Connect and Auth.[2] (D.I. 46, Ex. A at 2.) In addition to specifically naming these products, Yodlee also specifically identified Plaid's API—

---

[1] These products are actually software services that are provided to software developers who create smartphone apps and websites. They are accessible only by entering into a service contract agreement with Plaid. It is not possible to purchase these products through retail channels. Rather, the specific implementation details of Plaid's products are uniquely in its control.

[2] Specifically, Yodlee identified "Plaid's services and products that use Plaid's software including, but not limited to the Plaid 'Connect' and Plaid 'ACH Auth' products." (D.I. 46, Ex. A at 2.) Yodlee phrased its identification in this way to avoid the potential situation where Plaid changes the name of its products in an attempt to avoid infringement. Indeed, Plaid's publicly available GitHub site indicates that Plaid's Auth product was formerly known as "Info." (Ex. C ("Auth (formerly Info)").)

fr.com



because it is the mechanism through which Plaid's customers access and use the Auth and Connect products. (*Id.*)

According to the Scheduling Order, on June 4, 2015, Plaid was to use Yodlee's identification to produce "core technical documents . . . sufficient to show how the accused products work." (D.I. 26, ¶ 7(b).) Plaid never indicated that it thought Yodlee's identification of accused products was deficient. Instead, Plaid simply limited its production to documents describing Plaid's API made available to developers and failed to produce technical documents describing in detail how Plaid's data servers operate after receiving requests for information through the API—the very functions that Plaid's Connect and Auth products perform. (*See* D.I. 46.)

On June 8, 2015, after having an opportunity to review Plaid's production, Yodlee informed Plaid of the deficiencies in its core technical document production and requested supplemental production. (D.I. 46, Ex. B.) It was in response to this letter that Plaid raised, for the first time, a purported deficiency in Yodlee's identification of accused products.[3] (D.I. 46, Ex. C at 1.) Despite the explicit identification of Plaid's only two products, Connect and Auth, Plaid argued that Yodlee "did not identify specific accused products." and criticized Yodlee for "fail[ing] to provide identifying features such as product name or model number."[4] (*Id.*)

If Plaid truly believed that Yodlee's identification of accused products did not suffice, Plaid could have raised this issue any time after Yodlee served its identification of accused products and before Plaid unilaterally limited its production of core technical documents. Thus, the timing of Plaid's complaint shows that these alleged deficiencies are merely an after-the-fact attempt to justify its refusal to produce core technical documents regarding products specifically identified by Yodlee.

Yodlee's identification of accused products was more than sufficient given the early stage of these proceedings and the fact that information regarding Plaid's products is uniquely in Plaid's control. As this Court has stated, the identification of accused products is a "starting point in the discovery process" and the "Default Standard was [not] meant to categorically limit discovery only to those products that a plaintiff specifically accuses of infringement in its initial disclosures (or specifically accuses via supplementation thereafter)." *Invensas Corp. v. Renesas Electronics Corp.*, 287 F.R.D. 273, 283 (D. Del. 2012). Here, Plaid has even refused to provide discovery for products that Yodlee has specifically identified.

Moreover, none of the cases Plaid cited provides authority for Plaid's refusal to produce core technical documents, much less authority to refuse to produce documents for products that were *specifically identified* in Yodlee's Identification of Accused Products. These cases are also distinguishable for the following reasons:

---

[3] Plaid also raised, for the first time, alleged deficiencies in Yodlee's complaint. (D.I. 46, Ex. C at 1.) To the extent Plaid believed the allegations in Yodlee's complaint were deficient, Plaid could have moved for dismissal or for a more definite statement. Instead of raising this purported issue at the appropriate time, Plaid attempted to use this manufactured issue to create an excuse for not producing its core technical documents.

[4] However, Plaid does not identify its products by "model number."

- *Fenster Family Patent Holdings v. Siemens Med. Sols. USA, Inc.*, No. Civ.A.04-0038 JJF, 2005 WL 2304190 (D. Del. Sept. 20, 2005), involved a request to limit the number of asserted claims (from 90) and accused products (from <u>49</u>) <u>at the end of fact discovery</u>. *Id.* at *2-3. In contrast, this case is at the very beginning stages of discovery and Yodlee has specifically identified the two products that Plaid publicly offers for sale.

- *Honeywell Int'l Inc. v. Audiovox Commc'ns Corp.*, No. 04-1337-KAJ, 2005 WL 3988905 (D. Del. 2005), is also distinguishable because it involved an order to "specifically identify accused products." *Id.* at *1 n.2. Here, Yodlee has specifically identified, by name, Plaid's "Auth" and "Connect" products.

- *Eidos Commc'ns, LLC v. Skype Techs. SA*, 686 F. Supp. 2d 465 (D. Del. 2010), is distinguishable because it involved broad allegations accusing "'communication system products and/or methodologies' . . . without settling conclusively on whether they are targeting either a product or a method." *Id.* at 467. Here, Yodlee has specifically identified products by name and specifically described accused functionality.

- *Ondeo Nalco Co. v. EKA Chemicals, Inc.*, No. 01-537-SLR, 2002 WL 1458853, (D. Del. 2002), dealt with broad descriptions in a complaint that the accused products were "used in paper-making processes" or "to make paper." *Id.* at *1 n.2. In contrast, Yodlee has specifically identified Plaid's only two publicly offered products and specifically described accused functionality.

Moreover, Plaid's contention that "Yodlee has not provided Plaid information about what Yodlee is contending to actually be causing the alleged infringement" is a misunderstanding of the requirement for the identification of accused products. (D.I. 47 at 2.) Indeed, it confuses the initial identification of accused products with initial infringement contentions—a pleading that is not served under the Scheduling Order until *after* the Plaintiff has been afforded the opportunity to review the core technical documents. In any event, Plaid's statement is also factually incorrect because, on July 15, 2015, Yodlee served Plaid with its initial infringement contentions. Yodlee's initial infringement contentions include over 360 pages illustrating the correspondence of the documentation currently available to Yodlee to each element of the asserted claims.

Respectfully submitted,

*/s/ Christopher A. Winter*

Christopher A. Winter

Enclosures

cc: Counsel of Record (by CM/ECF and email)