IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

YODLEE, INC.,                              )
                                           )
            Plaintiff,                     )
                                           )
      v.                                   )      Civil Action No. 14-1445-LPS-CJB
                                           )
PLAID TECHNOLOGIES INC.,                   )
                                           )      PUBLIC VERSION
            Defendant.                     )
                                           )

## MEMORANDUM ORDER

Before the Court is a motion to stay the proceedings in the instant patent infringement

case, filed by Defendant Plaid Technologies Inc. ("Defendant" or "Plaid"). (D.I. 30) Defendant

seeks a stay pending resolution of its motion to dismiss, filed pursuant to Federal Rule of Civil

Procedure 12(b)(6) ("motion to dismiss"). (D.I. 11) The motion to dismiss asserts that all claims

of each of the seven patents-in-suit—United States Patent Nos. 6,199,077, 6,317,783, 6,510,451,

7,263,548, 7,424,520, 7,752,535, and 8,266,515 (collectively, the "patents-in-suit")—are patent-

ineligible under 35 U.S.C. § 101 ("Section 101"). (D.I. 12 at 1) For the reasons set forth below,

the motion to stay is DENIED.

## I.    BACKGROUND

### A.    Factual Background

Plaintiff Yodlee, Inc. ("Plaintiff" or "Yodlee") is a Delaware corporation with its

principal place of business in Redwood City, California. (D.I. 1 at ¶ 2) Plaintiff is a provider of

account aggregation services and personal financial management applications through software it

developed. (*Id.* at ¶ 8) Plaintiff has three primary business segments: Data Analytics, Financial

Institutions, and Yodlee Interactive. (D.I. 34 at ¶ 4) The Data Analytics segment "gives

businesses the ability to use large amounts of anonymized financial data to better understand and meet their customers' needs." (*Id.* at ¶ 5) The Financial Institutions segment provides services and products to financial institutions (such as banks and wealth management companies), including the Yodlee Platform, which is a "cloud-based platform [that] allows financial institutions to offer services and applications to their customers with functionality such as data aggregation, financial management, money movement, and bank-grade security." (*Id.* at ¶ 6) The third segment, Yodlee Interactive, provides entrepreneurs, partners and developers with access to Plaintiff's platform and Application Programming Interfaces ("APIs"). (*Id.* at ¶ 7) Yodlee Interactive APIs provide these users with "the ability to leverage Yodlee's data collection platform and related capabilities to acquire rich and meaningful data sets from their customers' current bank, credit card, investment, and loan accounts, as well as bills, insurance rewards programs, and other financial and quasi-financial accounts." (*Id.*)

Defendant is a Delaware corporation with its principal place of business in San Francisco, California. (D.I. 1 at ¶ 3) Defendant is alleged to infringe the patents-in-suit by offering "a competing software . . . API . . . that allows users and developers to interact with financial institutions." (*Id.* at ¶ 3; *see also id.* at ¶ 19) Its platform, *inter alia*, enables developers to create an application that: (1) authenticates a user's account information; and (2) retrieves financial account information from a financial institution on behalf of a specific single user. (D.I. 31 at 3 & ex. D)

### B.     Procedural Background

On December 1, 2014, Plaintiff filed this infringement suit seeking, *inter alia*, monetary relief and a permanent injunction against Defendant for any infringement of the patents-in-suit.

2

(D.I. 1 at 18-20)  On December 4, 2014, Chief Judge Leonard P. Stark referred the case to this

Court for certain purposes, including to resolve all motions to dismiss, stay, and/or transfer

venue. (D.I. 7)  Defendant filed the above-referenced motion to dismiss on January 23, 2015.

(D.I. 11)  A case management conference was held thereafter, and on May 8, 2015, the Court

entered a scheduling order. (D.I. 26)  A jury trial is scheduled for March 13, 2017. (*Id.* at ¶ 22)

On May 18, 2015, Defendant filed the motion to stay. (D.I. 30)  That motion was fully

briefed as of June 8, 2015. (D.I. 39)

## II.     STANDARD OF REVIEW

A court has discretionary authority to grant a motion to stay. *See Cost Bros., Inc.*

*v. Travelers Indem. Co.*, 760 F.2d 58, 60-61 (3d Cir. 1985); *see also Ethicon, Inc. v. Quigg*, 849

F.2d 1422, 1426 (Fed. Cir. 1988) ("Courts have inherent power to manage their dockets and stay

proceedings[.]")  This Court has typically considered three factors when deciding a motion to

stay:  (1) whether granting the stay will simplify the issues for trial; (2) the status of the litigation,

particularly whether discovery is complete and a trial date has been set; and (3) whether a stay

would cause the non-movant to suffer undue prejudice from any delay, or allow the movant to

gain a clear tactical advantage. *See, e.g., FMC Corp. v. Summit Agro USA, LLC*, Civil Action

No. 14-51-LPS, 2014 WL 3703629, at *2 (D. Del. July 21, 2014); *Cooper Notification, Inc. v.*

*Twitter, Inc.*, Civ. No. 09-865-LPS, 2010 WL 5149351, at *1 (D. Del. Dec. 13, 2010).

## III.    DISCUSSION

The Court will analyze the three stay factors in turn.

### A.     Simplification of Issues for Trial

When considering a motion to stay, the Court must assess whether a stay will "simplify

3

the issues [in question] and trial of this case." *Graphic Props. Holdings, Inc. v. Toshiba Am. Info., Sys., Inc.*, C.A. No. 12-213-LPS, 2014 WL 923314, at *2 (D. Del. Mar. 5, 2014). In assessing that question, our Court has considered how the possible outcomes of the proceeding or inquiry that the case would be stayed in favor of (here, the motion to dismiss) would affect the prospects for simplification. *Kaavo, Inc. v. Cognizant Tech. Solutions Corp.*, Civil Action Nos. 14-1192-LPS-CJB, 14-1193-LPS-CJB, 2015 WL 1737476, at *1 (D. Del. Apr. 9, 2015). In so doing, the Court cannot solely focus on the potential outcome most favorable to the party seeking the stay; instead, it must assess "*all* of the possible outcomes of the proceeding or inquiry that the case would be stayed in favor of[.]" *Kaavo*, 2015 WL 1737476, at *2; *see SenoRx v. Hologic, Inc.*, Civ. Action No. 12-173-LPS-CJB, 2013 WL 144255, at *3 (D. Del. Jan. 11, 2013) (considering how the case would be simplified if any of "three possible outcomes" of a reexamination proceeding occurred, and finding that "[w]hatever outcome occurs, there is the potential for the simplification of issues for trial") (citing *Abbott Diabetes Care, Inc. v. DexCom, Inc.*, C.A. No. 06-514 GMS, 2007 WL 2892707, at *5 (D. Del. Sept. 30, 2007)).

On the one hand, as Defendant points out, "if the Court grants the motion to dismiss [as to all asserted claims of all asserted patents], the case will simply go away and any discovery expense in the meantime will be a pure waste." (D.I. 31 at 6) If one could be sure that the motion to dismiss would be granted in this fashion, that would certainly favor a stay. *Cf. Mann v. Brenner*, 375 F. App'x 232, 239 (3d Cir. 2010) (noting that the Court has the discretion to conclude that it is "appropriate to stay discovery while evaluating a motion to dismiss where, if the motion is granted, discovery would be futile."); *see also Levey v. Brownstone Inv. Grp., LLC*, 590 F. App'x 132, 137 (3d Cir. 2014). At the other extreme, were the motion to dismiss

4

ultimately to be denied as to all asserted claims and patents, little efficiency gain would be realized. The issue of patent eligibility might be resolved as to some patents or patent claims, but the parties and the Court could potentially face the issue again at the summary judgment stage.[1] Meanwhile, no progress would have been made on any other claim or defense in the case.

In terms of assessing possible or probable outcomes, here the Court finds it particularly relevant that Plaintiff is asserting seven patents, containing 162 claims. The sheer number of asserted patents and asserted claims that will be at issue suggests that it is reasonable to infer that here (as opposed to, for example, a one-patent case involving a handful of challenged claims) there is a greater likelihood[2] that a portion of the case will survive the motion to dismiss. (*See* D.I. 33 at 9) It is true, as Defendants assert, that were even some claims or patents subject to dismissal, that would "narrow the dispute between the parties." (D.I. 31 at 6) But as to the claims and patents that remain, the majority of legal and factual issues will still be pending and

---

[1]     The patent eligibility question might arise again in the summary judgment context if, for example, the Court were to deny the motion to dismiss on the basis that: (1) issues of fact exist that require further development through discovery; or (2) claim construction is needed before the question of patent eligibility can be definitively resolved. Defendant suggests that if the Court identifies a "claim construction dispute that may be dispositive as to eligibility, the case will narrow to that dispute; there will be no other 'pending and unaddressed' 'legal issue[].'" (D.I. 39 at 2) But that is not the case. Even if the Court were to hold that the claims could be patent ineligible under certain constructions, and Defendant were to offer those constructions during the claim construction process, there is no guarantee that Defendant would prevail. And if it did not prevail on those issues at the *Markman* stage, then any number of "legal issue[s]" relating to those patent claims—as to infringement, invalidity, etc.—would remain squarely on the table in the case.

[2]     The Court has previously concluded, after reviewing case law on the subject, that in evaluating a motion to stay, it is not required to decide the legal merits of the pending motion (here the motion to dismiss) that is the impetus for the stay request. *See Kaavo*, 2015 WL 1737476, at *2 n.4 (citing cases). And so, in concluding that there is a real probability that the motion to dismiss will not turn out to be fully dispositive, the Court is not in any way addressing the actual merits of the motion to dismiss.

unaddressed, and a stay will have harmed the efficient progress of that portion of the case, not

helped it. *Cf. Ever Win Int'l Corp. v. Radioshack Corp.*, 902 F. Supp. 2d 503, 507 (D. Del.

2012) (noting, in light of the fact that many issues in the district court case would not be raised in

an *inter partes* reexamination proceeding, that "if some or all of the claims emerge from

reexamination, a not insignificant portion of the case will remain unilluminated by the PTO's

review").[3]

Ultimately, in light of the large number of patents involved in this case, the simplification

question seems about evenly balanced. The chance that a stay might lead to the total dismissal of

the case, or to a very significantly narrowed set of claims or legal issues, seems roughly similar to

the chance that it would not. The Court finds this factor to be neutral.

## B.  Status of Litigation

A motion to stay is most often granted when the case is in the early stages of litigation.

*See Abbott Diabetes Care, Inc.*, 2007 WL 2892707, at *5 (staying litigation where no Rule 16

scheduling conference had occurred, a scheduling order had not been entered, discovery had not

---

[3]     In assessing the "simplification" factor, the Court is also impacted by Chief Judge Stark's "Revised Procedures for Managing Patent Cases." In that document, Chief Judge Stark notes that "[g]enerally, we will not defer the [Case Management Conference] and scheduling process due to the pendency of" a motion to dismiss, transfer or stay. Honorable Leonard P. Stark, Revised Procedures for Managing Patent Cases (June 18, 2014), at 6, *available at* http://www.ded.uscourts.gov/judge/chief-judge-leonard-p-stark (follow "New Patent Procedures" tab; then download "Patent Procedures" document). This procedure certainly leaves plenty of room for the Court, if appropriate, to stay discovery and defer entry of a schedule if a case-dispositive motion to dismiss is pending. But the Court reads it as expressing the District Court's preference that, in the main, cases on its docket should move forward. Put in terms relevant to the simplification factor, this procedure suggests that when balancing the prospects for simplification in a case where a potentially dispositive motion to dismiss has been filed, the Court should be particularly attuned to the costs involved with such a stay (were that motion to dismiss to be later denied or denied in part).

begun, and "little time [had] yet to be invested in the litigation"). Conversely, in the later stages

of a case (such as when discovery is complete or nearly complete), a stay is less likely to be

granted as "the Court and the parties have already expended significant resources on the

litigation, and the principle of maximizing the use of judicial and litigant resources is best served

by seeing the case through to its conclusion." *SenoRx*, 2013 WL 144255, at \*5.

    As of the date when the motion to stay was filed,[4] the Court had (albeit recently) held a

Case Management Conference, resolved disputes regarding the proposed Scheduling Order, and

heard argument on the motion to dismiss. (D.I. 19, 23-26) The Scheduling Order and a

Protective Order had been entered, and discovery had begun. (D.I. 26, 27) Yet despite this, as

even Plaintiff acknowledges, the litigation is in its "early stages[.]" (D.I. 33 at 10) The bulk of

fact discovery, as well as the entirety of the expert discovery, claim construction and summary

judgment processes, will not be implicated for many months. Although the parties may have

"expended more than a *de minimis* amount of effort on the litigation thus far[,]" this factor favors

a stay. *SenoRx*, 2013 WL 144255, at \*6; *see also ImageVision.Net, Inc. v. Internet Payment

Exch., Inc.*, C.A. No. 12-054-GMS-MPT, 2012 WL 3866677, at \*2 (D. Del. Sept. 4, 2012)

(finding that this factor "favor[ed] a stay" where a scheduling order had been entered and a first

set of document requests and interrogatories had been served), *report and recommendation*

---

      [4]    *Cf. VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F. 3d 1307, 1317 (Fed. Cir. 2014) (noting, as to review of a motion to stay filed in favor of a petition for post-grant review submitted as part of the Transitional Program for Covered Business Method Patents, that "[g]enerally, the time of the motion [to stay] is the relevant time to measure the stage of litigation[,]" though acknowledging that there may be circumstances where a district court should consider evidence arising after that date); *see also SenoRx*, 2013 WL 144255, at \*6 & n.5. Since the motion to stay was filed, the parties have proceeded forward with discovery, and some discovery disputes have arisen. (D.I. 41, 43, 44, 46, 47) But even were the Court to take these facts into account here, its decision as to the "timing" factor would remain unchanged.

*adopted in part*, Civil Action No. 12-054-GMS-MPT, 2012 WL 5599338 (D. Del. Nov. 15,

2012); *cf. Kaavo*, 2015 WL 1737476, at *1-4 (finding that this factor strongly favored a stay

where a motion to stay had been filed prior to the Court's Case Management Conference, where

a scheduling order had not yet been entered, and where discovery had not yet begun at all).

### C.    Undue Prejudice

The parties make a number of arguments as to the "undue prejudice" factor, which the

Court addresses below.

### 1.    Relationship of the Parties

Much of the parties' discussion as to this final factor is focused on assessing the

relationship of the parties—a subfactor that is often very important in the stay calculus.  (D.I. 31

at 8-10; D.I. 33 at 5-7; D.I. 39 at 3-5)  This subfactor typically involves consideration as to

whether the parties are direct competitors. *See, e.g., Kaavo*, 2015 WL 1737476, at *3; *SenoRx*,

2013 WL 144255, at *7; *Cooper Notification*, 2010 WL 5149351, at *5.

"It is well established that courts are generally reluctant to stay proceedings where the

parties are direct competitors." *ImageVision.Net, Inc. v. Internet Payment Exch., Inc.*, C.A. No.

12-054-GMS-MPT, 2013 WL 663535, at *6 (D. Del. Feb. 25, 2013) (internal quotation marks

and citations omitted), *report and recommendation adopted*, 2013 WL 1743854 (D. Del. Apr. 22,

2013).  Courts have recognized that when the parties are direct competitors, there is a reasonable

chance that delay in adjudicating the alleged infringement will have outsized consequences to the

party asserting that infringement has occurred—including the potential for loss of market share

and an erosion of goodwill. *See, e.g., Nexans Inc. v. Belden Inc.*, C.A. No. 12-1491-SLR-SRF,

2014 WL 651913, at *3 (D. Del. Feb. 19, 2014); *SenoRx*, 2013 WL 144255, at *7 (citing *Nat'l*

8

*Prods., Inc. v. Gamber-Johnson LLC*, No. 2:12-cv-00840, 2012 WL 3527938, at \*2-3 (W.D. Wash. Aug. 14, 2012)).

Defendant argues that it and Plaintiff "focus on different markets[,]" with Plaintiff "provid[ing] *end-users* with the ability to aggregate their accounts" while Defendant "markets back-end solutions to *developers*." (D.I. 31 at 8 (emphasis in original)) Plaintiff, however, has put forward significant record evidence demonstrating that it directly competes with Defendant—at least with regard to the Financial Institution and Yodlee Interactive segments of Plaintiff's business.

More specifically, Plaintiff made of record a sworn Declaration submitted by Joseph Polverari, its Chief Strategy and Development Officer, who represents that he has direct involvement with Plaintiff's sales and account management processes. (D.I. 34 at ¶¶ 7, 13)  Mr. Polverari represents that Plaintiff's Yodlee Interactive platform is offered to "developers[,]" and that "Plaid competes against Yodlee Interactive APIs and also competes against Yodlee for Financial Institution customers." (*Id.*) In support, Mr. Polverari first lists two specific customers

Next, he cites by name a company

Mr. Polverari then goes on to reference by name four large corporations who are currently

He next cites another specific company

9



Next, Mr. Polverari references 11 companies by name that

Lastly, he lists three specific corporate customers as to which,

Plaintiff also cites to an archived webpage, dated April 10, 2015, found on the website

---

⁵        Some of the arguments that Defendant puts forward to counter the force of Mr. Polverari's declaration fall flat. For example, Defendant relies primarily on *Smarter Agent, LLC v. Mobilerealtyapps.com, LLC*, 889 F. Supp. 2d 673, 676 (D. Del. 2012), to argue that Mr. Polverari's declaration is "self-serving" and thus "'unpersuasive.'" (D.I. 39 at 3) *Smarter Agent*, however, is easily distinguishable. There, this Court found that a declaration submitted by the plaintiff's Chief Executive Officer, offered in order to bolster plaintiff's claims of prejudice were a stay granted, was "largely conclusory" and amounted to "generalized allegations[.]" *Smarter Agent*, 889 F. Supp. 2d at 676. The *Smarter Agent* Court focused on the fact that the CEO's declaration included almost no "names" of persons or entities said to be associated with the allegations set out therein. Here, in contrast, Mr. Polverari has offered specifics. His declaration lists no fewer than 22 specifically-named companies (some of them very large institutions)

That kind of specificity (at least as to customer identification) is what a court hopes to see when reviewing these kinds of motions, but rarely gets.

Defendant also argues that "the two customers [that] Yodlee asserts Plaid outcompeted it for have earned Plaid only" a modest amount of revenue, especially as compared to the very large amount of revenue that Plaintiff earned in 2014 alone. (D.I. 39 at 3 (citing D.I. 31, exs. A & B)) While the amount of revenue that these two customers brought Defendant is certainly relevant to the prejudice inquiry, it is not the only relevant issue. Also relevant would be the answers to questions such as: (1) How much revenue would these two customers have earned Plaintiff had they not departed for Defendant?; (2) What amount of revenue does Plaintiff stand to lose, were some or all of the customers that Mr. Polverari cites as Plaid targets to actually switch to Plaid?; or (3) What does this evidence suggest about whether Yodlee might lose more customers to Plaid in the future? Mr. Polverari's declaration provides insight into some of these questions. But it also underscores that the amount of revenue Plaid has to date obtained at Yodlee's expense is not the only fact relevant to this inquiry.

10

www.quora.com. On that webpage, a writer asks "What are some alternatives to Yodlee for accessing bank information?" (D.I. 35, ex. C)  One of the posted answers was written by Defendant's co-founder Zach Perret.  In it, Mr. Perret advises the questioner to "check out Plaid[.]"  (*Id.*; *see also* D.I. 33 at 3)  Mr. Perret goes on to explain to another commenter how to get access to Plaid.  (D.I. 35, ex. C)[6]  Defendant argues that these posts are not relevant to the question of competition, (D.I. 39 at 4), but that argument is weak.  One would be hard-pressed to conceive of a better example of "direct competition" evidence than a document in which one defendant's leaders identifies its products or services as an "alternative" to the plaintiff's products or services in the relevant sphere.

Additionally, it is worth noting that Plaintiff and Defendant are not strangers to each other; indeed, the evidence suggests that the two parties have had significant past interactions regarding Plaintiff's technology.  In 2012, Defendant's co-founders evaluated Plaintiff's technology, and considered whether to take a license to Plaintiff's aggregation APIs.  (D.I. 1 at ¶¶ 10-15; D.I. 31 at 3; D.I. 34 at ¶ 9)  This led, in early 2013, to execution of a one-year agreement between the parties (an agreement that was terminated a few months later), in which Defendant was to license certain of Plaintiff's services.  (D.I. 1 at ¶¶ 16-18; D.I. 34 at ¶ 10)  The fact that Defendant was evaluating Plaintiff's API-related technology further suggests that the parties are participants in the same relevant business area.

For its part, Defendant includes exhibits demonstrating that Plaintiff also competes with various other companies.  (D.I. 31, ex. B at 19; *id.*, ex. H); *cf. Neste Oil OYJ v. Dynamic Fuels,*

---

[6]       According to Plaintiff, a June 1, 2015 printout of the same portion of this website no longer includes Mr. Perret's answer.  (D.I. 35, ex. D; *see also* D.I. 33 at 3 n.4)

*LLC*, Civil Action No. 12-1744-GMS, 2013 WL 3353984, at *3-4 (D. Del. July 2, 2013) ("The presence of multiple active firms in the relevant market . . . may decrease the likelihood of . . . harm befalling the plaintiff.")  What is less clear from these documents, however, is how many competitors there are in the particular markets in which Defendant has been shown to compete with Plaintiff.  It is at least helpful to Defendant that two of the documents it submits (Yodlee's Form 10-K for the period ending in December 2014, and a May 2015 Yodlee "Company Overview") contain sections specifically relating to competition—and that the competitors listed in those sections do not include Defendant.  (D.I. 31, ex. B at 19; *id.*, ex. I at 16)  But it is not clear that these documents were intended to be comprehensive lists, nor that they are directed to all of the market segments in which the parties are alleged to compete.[7]

Defendant also asserts that Plaintiff's failure to seek a preliminary injunction against it is evidence of the fact that parties are not competitors.  (D.I. 31 at 9)  It is true that "[w]here the question of 'direct competition' remains unanswered, courts have sometimes considered whether the plaintiff sought a preliminary injunction."  *Neste Oil Oyj v. Dynamic Fuels, LLC*, Civil Action No. 12-662-GMS, 2013 WL 424754, at *3 (D. Del. Jan. 31, 2013).  And here, though Plaintiff did seek injunctive relief in its Complaint, (D.I. 1 at 19), it has not moved for a preliminary injunction.  That fact amounts to a data point the Court can consider in assessing the question of competition, *see Ever Win*, 902 F. Supp. 2d at 511, though not one that is dispositive,

---

[7]        Indeed, in another portion of the Form 10-K, Plaintiff describes the instant suit in a section relating to alleged intellectual property misappropriation by "our competitors[.]"  (D.I. 31, ex. B at 33)

*see SenoRx*, 2013 WL 144255, at *8.[8]

In sum, it is at least clear from the Complaint that Plaintiff is accusing Defendant's software that "provide[s] account aggregation and personal financial management services to its customers" as infringing the patents-in-suit, (D.I. 1 at ¶ 21), and that some of Defendant's products in that realm compete with Plaintiff's platform and APIs. There is also multi-faceted evidence (particularly from Mr. Polverari's Declaration) that this competition has financially harmed Plaintiff in the past and will likely continue to do so in the future. The scope of these markets and how seriously such competition threatens Plaintiff is, admittedly, less clear. But in the end, Plaintiff's evidence of competition was stronger and more specific than Defendant's evidence to the contrary. In such a circumstance, the Court concludes that Plaintiff has demonstrated the potential for some amount of undue prejudice were a stay granted, due to the likelihood of competitive impact. This subfactor will work against the grant of a stay. *See, e.g.*, *Davol, Inc. v. Atrium Med. Corp.*, Civil Action No. 12-958-GMS, 2013 WL 3013343, at *3-5 (D. Del. June 17, 2013) (holding that this factor "weighs against granting a stay" where Plaintiff "demonstrated that it is a direct competitor of [Defendant] in a limited market."); *ImageVision.Net*, 2012 WL 3866677, at *4 (finding that "direct competition" between the parties as to particular products "strongly favor[ed] denying [the] motion for a stay").

### 2.    Other Subfactors Relating to Undue Prejudice

---

[8]    Defendant additionally claims that Plaintiff delayed in filing suit subsequent to the issuance of the patents-in-suit, and that this fact further suggests that the parties do not significantly compete. (D.I. 31 at 10) But the evidence is that as of 2013, Defendant was Plaintiff's customer, and did not begin selling infringing products in competition with Plaintiff until thereafter. (D.I. 33 at 7 (citing D.I. 34 at ¶¶ 9-11)) In light of that, the Court does not find any "delay" in filing suit here to be particularly relevant.

Defendant makes several other arguments regarding the "undue prejudice" factor. For example, Defendant argues that there will be only a "short" delay if a stay is granted, because briefing on the motion to dismiss has already been completed and the Court has already heard oral argument. (D.I. 31 at 7) Yet considering the Court's docket, even though that motion is fully briefed and argued, it may still take some months for it to be resolved. While the potential for delay alone "does not, by itself, amount to undue prejudice[,]" *Ever Win*, 902 F. Supp. 2d at 509 (citation omitted), it is a subfactor the Court can consider. The likelihood of some real delay here also favors Plaintiff's position.

Defendant next asserts that because it is a small start-up that lacks its own legal team, it would suffer undue prejudice by having to "interrupt" its operations to handle discovery obligations were the case not stayed. (D.I. 31 at 10) Our Court has at times explicitly considered whether the *moving party* would face undue hardship or inequity in the absence of a stay, explaining that such an inquiry would be relevant to the "prejudice" factor if there is "even a fair possibility that the stay . . . will work damage to [another party]." *ImageVision.Net, Inc.*, 2012 WL 5599338, at *3 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)) (additional citations omitted).[9] Where such a "fair possibility" has been established (as here), then the moving party ought to demonstrate that the denial of a stay would result in a "clear case of

---

[9]     *See also Cooper Notification*, 2010 WL 5149351, at *2 (citing *Landis* and noting that "a showing of hardship or inequity is 'generally' needed [to demonstrate] that the balance of equities favors a stay" but also that such a showing is not required, as "circumstances may arise in which the overall balance could be tipped in favor of a stay even if proceeding with the litigation will cause no undue hardship or prejudice to the party seeking a stay").

14

hardship or inequity." *Landis*, 299 U.S. at 255; *see also SenoRx*, 2013 WL 144255, at *9 n.12.[10]

Defendant has failed to make out that case. It cites to no evidence specific to its company (such

as an affidavit from one of its employees) in support of its claim that, were it required to go

forward and defend the suit, this would severely disrupt its operations. (D.I. 31 at 5-10) In the

absence of any such evidence, the Court cannot give weight to Defendant's argument here.

Lastly, Defendant notes that the timing of its motion to stay does not suggest any

improper "'dilatory intent'" on its part. (D.I. 31 at 7-8 (citing *Neste Oil*, 2013 WL 3353984, at

*2)). Defendant is correct—it made clear its intent to seek a stay from the outset of the litigation,

and it filed the stay motion at an early stage. (D.I. 31 at 3-4)

### 3.    Conclusion as to Undue Prejudice

The combination of the real prospect of competitive harm to Plaintiff if a stay is granted,

coupled with the delay that such a stay would entail, together indicate that the "undue prejudice"

factor should weigh against a stay.

### III.    CONCLUSION

On balance, the possibility of simplification of the issues is neutral, the status of the

litigation weighs squarely in favor of a stay, and the prospect of undue prejudice weighs squarely

against a stay. While reasonable minds could disagree as to the right outcome, the Court is

ultimately persuaded that the prospect for harm to Plaintiff were a stay granted is the most

compelling factor here. Therefore, the motion to stay is DENIED.

---

[10]     Our Court has found that added litigation cost that would be incurred if a stay is
denied does not amount to the kind of "undue" hardship or inequity that is referenced in the case
law. *See Personalized User Model, L.L.P. v. Google, Inc.*, C.A. No. 09-525-LPS, 2012 WL
5379106, at *2 (D. Del. Oct. 31, 2012).

15

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order . Any such redacted version shall be submitted no later than **July 28, 2015** for review by the Court, along with a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: July 20, 2015

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

16