# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| YODLEE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 14-1445-LPS |
| | : | |
| PLAID TECHNOLOGIES, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

Robert M. Oakes and Christopher A. Winter, FISH & RICHARDSON P.C., Wilmington, DE

David M. Barkan and James Huguenin-Love, FISH & RICHARDSON P.C., Redwood City, CA

    Attorneys for Plaintiff Yodlee, Inc.


Frederick L. Cottrell, III and Arjun J. Mohan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE

Brian M. Buroker, GIBSON, DUNN & CRUTCHER, Washington, DC

Neema Jalali and Alexander N. Harris, GIBSON, DUNN & CRUTCHER, San Francisco, CA

    Attorneys for Defendant Plaid Technologies, Inc.


## **MEMORANDUM OPINION**

January 15, 2016
Wilmington, Delaware

STARK, U.S. District Judge:

On December 1, 2014, Plaintiff Yodlee, Inc. ("Yodlee" or "Plaintiff") filed suit against Defendant Plaid Technologies, Inc. ("Plaid" or "Defendant") alleging infringement of U.S. Patent Nos. 6,199,077 (the "'077 patent"), 6,317,783 (the "'783 patent"), 6,510,451 (the "'451 patent"), 7,263,548 (the "'548 patent"), 7,424,520 (the "'520 patent"), 7,752,535 (the "'535 patent"), and 8,266,515 (the "'515 patent"). (D.I. 1)  The patents-in-suit relate to methods and apparatuses for gathering and aggregating information from web sites.

The parties submitted technology tutorials (D.I. 72, 73) and claim construction briefing (D.I. 84, 85). The Court held a claim construction hearing on November 17, 2015. (D.I. 339 ("Tr."))

## I.  LEGAL STANDARDS

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."

1

*Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope

2

using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)) (internal quotation marks omitted).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to

3

establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

## II.     ESTOPPEL EFFECT OF PRIOR CONSTRUCTIONS

A preliminary matter disputed by the parties is the extent to which, if at all, the Court is bound by another court's constructions of certain disputed claims. In an earlier case in the Northern District of California, Plaintiff Yodlee asserted some of the patents-in-suit against a different defendant. *See Yodlee, Inc. v. CashEdge, Inc.*, 2006 WL 183342 (N.D. Cal. July 7, 2006). The *CashEdge* Court held a claim construction hearing and issued a claim construction

order, which construed some terms that are identical to those in dispute here and construed others that overlap with terms in dispute here. Defendant Plaid asserts that both collateral estoppel and judicial estoppel should prevent Yodlee from advancing constructions in this case that differ from those it advanced in the *CashEdge* case.

Regional circuit law governs the estoppel effect of prior decisions. *See e.Digital Corp. v. Futurewei Technologies, Inc.*, 772 F.3d 723, 726 (Fed. Cir. 2014). As explained below, the Court concludes that neither collateral nor judicial estoppel compels it to adopt particular constructions.

### A.    Collateral Estoppel

In the Third Circuit, collateral estoppel applies where: "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *Burlington N. R.R. v. Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1231-32 (3d Cir. 1995) (internal quotation marks omitted). The Federal Circuit has not addressed whether claim construction decisions have collateral estoppel effect under the law of the Third Circuit. However, in interpreting the Ninth Circuit's similar collateral estoppel standard, the Federal Circuit held that a district court's claim construction decision is not necessarily binding on future courts. *See e.Digital.*, 772 F.3d at 727. Rather, the preclusive effect of a prior district court's claim construction ruling depends on the specific facts of the case, requiring the later court to analyze whether "each of the requirements of collateral estoppel are met." *Id*.

The parties here dispute (among other things) whether the *CashEdge* constructions constitute a final and valid judgment. In the *CashEdge* litigation, Yodlee requested that the case

5

be dismissed after the claim construction order issued – and the *CashEdge* Court granted this request. (D.I. 75-1 at 54-55) Yodlee asserts that this voluntary dismissal did not "finalize" the interlocutory claim construction order. (Tr. 6 at 3-5) Plaid contends that the *CashEdge* Court's claim construction order should be treated as final because Yodlee did not move to vacate it. (*Id.*)

The Court agrees with Yodlee that the *CashEdge* Court's claim construction order is not a "final judgment" for collateral estoppel purposes. A district court may engage in "rolling" claim construction, updating its constructions as the record develops. *See, e.g., Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002); *Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996).[1] Given that the *CashEdge* court would have had the opportunity to update its constructions if the case had proceeded to trial rather than being dismissed shortly after the claim construction order was entered, the Court concludes that the *CashEdge* claim construction order was not a final and valid judgment for collateral estoppel purposes.

Additionally, most of the *CashEdge* constructions resolved disputes that were somewhat different than those presented here. The Federal Circuit has stated that collateral estoppel effect can be given to a claim construction order when an earlier court undertook an "identical claim construction inquiry." *e.Digital*, 772 F.3d at 726. Claim construction inquiries differ when a court considers, or opts not to consider, limitations that might have "modifie[d], clarifie[d], or

---

[1] Judges in the Northern District of California – where the *CashEdge* case was litigated – have expressly recognized this possibility. *See, e.g., Altera Corp. v. PACT XPP Techs., AG*, 2015 WL 4999952, at *7 (N.D. Cal. Aug. 21, 2015); *MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2013 WL 3778314, at *1 n.3 (N.D. Cal. July 16, 2013).

even inform[ed] the construction" of another court.  *Id.*  Here, many of the terms in dispute are different from those construed by the *CashEdge* Court.  For this reason, as well, collateral estoppel does not apply.

### B.   Judicial Estoppel

"Judicial estoppel is an equitable doctrine that prevents a litigant from 'perverting' the judicial process by, after urging and prevailing on a particular position in one litigation, urging a contrary position in a subsequent proceeding – or at a later phase of the same proceeding – against one who relied on the earlier position."  *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1290 (Fed. Cir. 2005).  While "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," the Supreme Court has outlined several factors that may "inform the decision whether to apply the doctrine in a particular case."  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation marks omitted).  In the Third Circuit, courts consider three factors when determining whether to apply judicial estoppel: (1) whether a party's position is "irreconcilably inconsistent" with a position it took earlier; (2) whether the party adopted the position in bad faith; and (3) whether judicial estoppel is tailored to address the harm caused by the party's inconsistent positions, and "no lesser sanction [is] sufficient."  *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d. Cir. 2009) (internal quotation marks omitted).  In general, judicial estoppel is not appropriate unless the party convinced an earlier court to adopt its prior position.  *See United States v. Pelullo*, 399 F.3d 197, 222-23 (3d Cir. 2005) (quoting *New Hampshire*, 532 U.S. at 750-51).

Having considered these factors, the Court concludes that Yodlee is not judicially

7

estopped from advocating the claim construction positions it is taking in this Court.  The Court

finds that none of the positions presented here are "irreconcilably inconsistent with" Yodlee's

positions in the *CashEdge* case.  Nor does the Court perceive a risk of conflicting decisions, for

reasons including that in most instances the issue before this Court is not identical to the issue

that was before the *CashEdge* Court.

Accordingly, the Court will apply the ordinary claim construction principles to resolving

the parties' disputes, on a term-by-term basis.

## III.   CONSTRUCTION OF DISPUTED TERMS[2]

### 1.      "Internet Portal"[3] "Internet Portal system"[4]

| Yodlee |
| --- |
| "A website, requiring user authentication, used to connect with Internet destination[s] on behalf of end users and retrieve personal information," or, in the alternative, "an Internet connected server that provides data retrieved from one or more Internet sites" |
| **Plaid** |
| "A website (a set of content to be rendered by a web browser to generate human-readable web pages served by a Web server in a World Wide Web format such as HTML), requiring user authentication, used to connect with Internet destination[s] on behalf of end users and retrieve personal information" |
| **Court** |
| "an Internet-connected server that provides data retrieved from one or more Internet sites" |

The *CashEdge* court construed the term "Internet Portal," adopting the construction

Yodlee proposed there: "a website, requiring a username and password entered by the users for

---

[2] The parties have agreed to certain constructions, all of which the Court will adopt.

[3] This term appears in claim 1 of the '077 patent.

[4] This term appears in claim 7 of the '077 patent.

access, utilized as an entry point for other web sites." *CashEdge*, 2006 WL 1883342 at *8.  Both

parties would accept this construction here.  However, they disagree about what that construction

means, principally because the parties here dispute what the word "website" means in the

*CashEdge* Court's construction.  Having already concluded that neither collateral nor judicial

estoppel applies, and finding that the parties to the instant case dispute the meaning of "website"

in a manner that was not put directly at issue in the *CashEdge* case, the Court must resolve the

dispute now presented here.

The terms "Internet Portal" and "Internet Portal system" appear in the preambles of claims

1 and 7 of the '077 patent, respectively.  Claim 1 describes an "Internet Portal" as comprising

exclusively the apparatus necessary to access and extract information from Internet sites.  For this

reason, the Court concludes that the plain and ordinary meaning of "Internet Portal" is "an

Internet connected server that provides data retrieved from one or more Internet sites."

The text of the claim does not refer to a "web site" or other interface, and the specification

does not explicitly or implicitly require one.  The specification explains that "many users will

access their [information] through a WEB page . . . however, this is not required in order to

practice the present invention."  '077 patent col. 14:19-29.  Rather, the specification discloses

embodiments of the Internet Portal that do not directly connect to an interface at all.  *See* '077

patent col. 15:22-37 (describing how claimed system can be implemented at different locations in

data network).  Further, claims 2 and 8, which depend from claims 1 and 7, add the sole

limitation of a user interface.  *See*, e.g., '077 patent col. 1 18:16-18 (claiming "the Portal of claim

1 further comprising a ***configuration and initiation interface***" to allow user to direct portal to

gather information) (emphasis added).  Hence, the doctrine of claim differentiation further

9

supports the Court's construction. *See SanDisk Corp. v. Kingston Tech. Co., Inc.*, 695 F.3d 1348, 1361 (Fed. Cir. 2012) ("Where . . . the sole difference between the independent claim and the dependent claims is the limitation that one party is trying to read into the independent claim, the doctrine of claim differentiation is at its strongest.") (internal quotation marks omitted). Additionally, even when the '077 patent discloses or claims an Internet Portal that includes an interface for delivering information directly to a subscriber, the specification does not require that the interface be a web site. *See* '077 patent col. 8:58-61; *id.* col. 16:56-60 (stating that information may be delivered "in a form other than a WEB page"); *id.* col. 14:19-29 (explaining that invention includes embodiments in which "information [is] formatted and delivered to one of a variety of Internet-capable appliances," some of which cannot be used to load web pages).

 For all of these reasons, the Court adopts Yodlee's alternative proposed construction.

 **2. "In an Internet Portal system, a method for gathering data specific to a person from a plurality of Internet sites storing data specific to that person, the method comprising the steps of:"**[5]

| |
|---|
| **Yodlee**<br>"In an Internet Portal system" is not limiting.<br><br>For the rest of the preamble Yodlee proposes "[a method for gathering] data specific to a person from more than one internet destination" |
| **Plaid**<br>"For a specific natural person, a system maintains an entry for that person, associates at least two entries of user-selectable addresses of Internet sites to that person-specific entry, and enables the person to select where each of the at least two entries of addresses of Internet sites stores personal information relating to that person" |

_____

[5] This term appears in claim 7 of the '077 patent.

> **Court**
>
> "In an Internet Portal system": "Using an Internet portal"
>
> The term "Internet Portal" is as previously construed as "an Internet connected server that provides data retrieved from one or more Internet sites"

The parties disagree about whether the term "Internet Portal System," as used in the preamble of claim 7 of the '077 patent, is limiting.  A preamble of a claim is limiting if it "recites essential structure." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1305-06 (Fed. Cir. 2005).  Here, the words "Internet Portal system" do provide essential structure.  Dependent claims 8, 9, and 11 each add limitations that derive antecedent basis from the Internet Portal System.  Based on the text of the claims, therefore, the Court finds that "Internet Portal system" is limiting.[6]  "Internet Portal" has the meaning already identified by the Court in resolving the parties' first dispute.

The Court finds no need to construe the remaining language in the preamble, as it is used in the patent consistent with its plain and ordinary meaning.  *See, e.g.*, *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (finding no error in non-construction of "melting"); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (finding no error in Court's refusal to construe "irrigating" and "frictional heat").

---

[6] The Court disagrees with Yodlee that the Federal Circuit's decision in *Storage Tech. Corp. v. Cisco Systems, Inc.*, 329 F.3d 823 (Fed. Cir. 2003), precludes the Court from finding this claim language to be a limitation.  In that case, the court found that a preamble term was not limiting because the specification consistently used a different term for the structure that was essential to carrying out the claims.  *Id.* at 831.  Here, the term "Internet Portal system" refers to a system that includes an Internet Portal, which is essential to carrying out the method of claim 7.

11

3.   **"list of addresses of Internet sites [associated with a specific person, which sites store information specific to the person]"**[7]

| **Yodlee** |
| --- |
| "one or more addresses of Internet sites" |
| **Plaid** |
| "For a specific natural person, a system maintains an entry for that person, associates at least two entries of user-selectable addresses of Internet sites to that person-specific entry, and enables the person to select those addresses to visit the associated destinations, where each of the at least two entries of addresses of Internet sites stores personal information relating to that person" |
| **Court** |
| "list of addresses of Internet sites" means "one or more addresses of Internet sites" |

The "list of addresses" in the disputed term is the set of addresses of Internet sites from which the claimed apparatus might extract user information.  Yodlee argues that this "list" may contain only one entry, pointing to language in the specification that contemplates using the claimed apparatus to navigate to a single Internet site.  (*See* D.I. 76)  Plaid responds that the patentee's use of the plural forms "addresse*s*" and "Internet site*s*" makes clear that a list must contain "at least two" addresses.  (D.I. 74 at 6 (emphasis added))

Plaid is correct that the concept of a "list" generally connotes a set of more than one element.  Further, as Plaid observes, Yodlee's technology was specifically designed to create a shortcut for accessing multiple web sites, and the invention does not provide this benefit where the "list" contains only a single web site address.  (D.I. 74 at 7)  Yodlee concedes that the word "list" is not the best way to describe a set of ***one*** or more items.  (Tr. at 34)

Nonetheless, the Court's task is to apply claim construction principles to the disputed claim term.  Beginning with the plain and ordinary meaning of the claim term, the Court finds

---

[7] This term appears in claim 1 of the '077 patent.

that a "list" is not limited to sets including multiple elements, but rather refers to the set of elements associated with the topic of the list, which may be just one. The patent provides no basis (e.g., lexicography or disclaimer) to further limit the claim scope to embodiments that involve two or more Internet sites. Indeed, the specification discloses examples in which the invention is used to navigate to a single Internet site. *See* '077 patent col. 2:40-46; *id.* col. 15:53-56. For this reason, the Court finds that both the intrinsic and extrinsic record support Yodlee's proposed construction.

The Court finds no need to construe the remaining language in this claim term, as it is used in the patent consistent with its plain and ordinary meaning.

4.  **"gatherer"**[8] **"gather[ing] agent"**[9] **"gathering spitware agent"**[10] **"path agents"**[11]

| Yodlee |
| --- |
| "software component that uses the logic and/or structure of a given Internet site to extract data values" |

| Plaid |
| --- |
| Phrase "spitware agents" is indefinite. |
| For all other terms and for the "spitware agents" term if a construction is offered, the interpretation should be: "Software that collects a natural person's information by parsing a web page rendered by a browser after the web page is retrieved from a website. A website is a set of human-readable web pages served by a Web server in a World Wide Web format such as HTML." |

---

[8] This term appears in claim 1 of the '077 patent.

[9] This term appears in claims 1, 3, 6, 9, 10, and 12 of the '077 patent.

[10] This term appears in claim 1 of the '077 patent.

[11] This term appears in claim 4 of the '077 patent.

| Court |
| --- |
| "spitwire agents" is not indefinite |
| "software component that uses a site-specific script and/or site-specific data to extract data values from an Internet site based on the site's logic and structure" |

As an initial matter, the Court rejects Plaid's contention that the term "gathering spitware agent" is indefinite. The Court agrees with Plaid that "'spitware' is a nonsense term without meaning to those in the art and [is] used nowhere else in the patent." (D.I. 74 at 8) However, the Court also agrees with Yodlee that "spitware" is a printing error by the United States Patent and Trademark Office ("PTO"); the prosecution history shows that the most recent amendment to the claim referred to "software" rather than "spitware." (D.I. 76 at 9) For its part, Plaid does not disagree that "spitware" is a typographical error for "software." (D.I. 61 at 25; D.I. 74 at 8) Rather, Plaid's contention is that Yodlee has not asked the PTO to correct this error and the Court is powerless to do so. (D.I. 76 at 9)

A court may correct an error in a patent if (1) the error is evident on the face of the patent, such that the "the correction is not subject to reasonable debate based on consideration of the claim language and the specification," and (2) the prosecution history does not suggest that a different construction is appropriate. *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009) (internal quotation omitted). If these two conditions are satisfied, then the patent should not be invalidated based on the error unless there is "evidence of culpability or intent to deceive by delaying formal correction." *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005).

Here, it is evident from the face of the patent that "spitware agent" is a typographical error. Other than its sole use in claim 1, the term "spitware" does not appear in the specification.

14

That the patentee intended the claim to read "software agent" is not subject to reasonable debate, for reasons that include that "software" and "software agent" do appear repeatedly throughout the patent. Rather than suggesting a different construction than "software agent," the prosecution history confirms that "software agent" is exactly what the patentee claimed. That is, the prosecution history demonstrates that the change from the claimed "software" to "spitware" was solely the result of a PTO printing error. (D.I. 66-4 at 6) Finally, there is no evidence that Yodlee was culpable or intended to deceive anyone by neglecting to seek formal correction from the PTO. Accordingly, the Court can and will correct "spitware agent" to read "software agent" and will not deem claims containing this term to be indefinite.

This takes the Court to the parties' disputes as to the proper construction of the terms "gatherer," "gather[ing] agent," "gathering software agent," and "path agent." Each of these refers to the means by which the claimed apparatus retrieves information from web sites. The specification explains that the "gatherer" uses a site-specific script or template to identify desired information based on the logic and structure of an Internet site. *See* '077 patent col. 11:35-55; *id.* col. 9:54-64. The parties disagree about three things: (1) whether the gatherer necessarily operates by "parsing a web page;" (2) whether that web page must be "rendered by a browser;" and (3) whether the data extraction occurs "after the web page is retrieved from a web site."

The Court agrees with Yodlee that the gatherer does not necessarily operate by "parsing." The doctrine of claim differentiation supports this conclusion. Independent claims 1 and 6 recite a gatherer, while dependent claims 7 and 12 add the sole additional limitation that the gatherer operates by parsing. (D.I. 76 at 8) "[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent

15

claim." *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004). "This presumption is especially strong where the limitation in dispute is the only meaningful difference between an independent and dependent claim." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir.), *cert. denied*, 135 S. Ct. 719 (2014). While claim differentiation is not dispositive, and a party may overcome the presumption by demonstrating that the specification or prosecution history requires a contrary construction, *see Seachange Int'l. Inc. v. C–COR*, Inc., 413 F.3d 1361, 1369 (Fed. Cir. 2005), Plaid has not done so here.

Turning to the "rendering" and "retrieving" limitations Plaid has proposed, the Court is not persuaded that these should be read into the claims. Plaid asserts that "rendering" and "retrieving" are necessary limitations of the claims because, as a technical matter, a web page cannot be "parsed" until it is first "rendered by a browser" and "retrieved" from a web site. (D.I. 84 6-7) Plaid has not, however, identified record evidence to support this position. Further, Yodlee points to claim language that appears to be inconsistent with the supposed technical requirements asserted by Plaid. (D.I. 76 at 8) Also, the Court has rejected Plaid's position on the parsing portion of the dispute with respect to this term. Hence, the Court will not include Plaid's proposed limitations in its construction of this claim term.

5. **"authenticating too each site accessed as the person"**[12] **"authenticating to the sites as the person"**[13]

| Yodlee |
| --- |
| "accessing each site utilizing user login credentials" |

---

[12] This term appears in claim 1 of the '077 patent.

[13] This term appears in claim 7 of the '077 patent.

| Plaid |
| --- |
| The phrase "authenticating too each site" is indefinite because it makes no sense. |
| If a construction is offered it should be, and the construction of "authenticating to the site as the person" should be: "Fully simulating how a user would log into each website using rendered web pages from the web site (a set of content to be rendered by a web browser to generate human-readable web pages served by a Web server in a World Wide Web format such as HTML), acting exactly as if it is the user." |

| Court |
| --- |
| "accessing each site utilizing user login credentials" |

Plaid asserts that the language "authenticating *too* each site accessed as the person" (emphasis added) renders claim 1 indefinite because it is "contextually nonsensical." (D.I. 74 at 9) Yodlee responds that the word "too" is the result of a PTO error, which the Court should correct to read "to." The Court agrees with Yodlee.

As with the "spitware" term above, the error here is evident on the face of the patent and there can be no reasonable debate that the correction is to change "too" to "to." *See Ultimax*, 587 F.3d at 1353. The term "authenticat[ing] too" does not appear anywhere else in the claims or specification, whereas the term "authenticat[ing] to" appears three other times in the claims. Here, again, the prosecution history fully supports the Court's authority to correct the error, as it shows that the most recent amendment to the claim read "authenticating *to* the site" (see D.I. 76 at 10), revealing that the change from "to" to "too" was solely the result of a PTO printing error. Although Yodlee did not seek to correct this error, there is no evidence that Yodlee opted not seek a formal correction in order to deceive others or for any other culpable reason. Given the Court's correction of the typographical error, the claim term is not indefinite.

Turning to the claim construction dispute, the parties agree that authentication involves accessing a web site by employing user log-in credentials. (D.I. 76 at 10; D.I. 74 at 10)

17

However, Plaid argues that "authenticating . . . as" a person further requires accessing a web site "as the person would." (D.I. 74 at 9)  Specifically, Plaid contends that a portal "authenticating . . . as" a person must do so via a "rendered" web site in a manner that "fully simulate[s] how a user would log into" that site.  (*Id.*)

Plaid does not identify intrinsic evidence that supports these additional limitations it would have the Court read into the claim language.  It is true that the patentee added the words "authenticating to each site as the person" in order to overcome prior art that included "autologins." (D.I. 66-4 at 6-12 and 70-71)  However, the patentee simultaneously made several other additions to the claim language to overcome the same art.  The patentee stated without elaboration that each of these limitations was absent from the prior art. (D.I. 66-4 at 12)  The prosecution history, therefore, does not provide a persuasive basis for limiting the claim scope to the extent proposed by Plaid.  Instead, the Court concludes that Yodlee's construction is supported by the intrinsic evidence.

6.    **"gathering cycle"**[14]

| Yodlee |
| --- |
| "access and retrieval occurrence" |

| Plaid |
| --- |
| Term is indefinite because it is not reasonably clear on its face or ever mentioned in the specification or file history. |
| If a construction is given, it should be: "Software that collects a natural person's personal information by parsing a web page rendered by a browser after the web page is retrieved from a website.  A website is a set of human-readable web pages served by a Web server in a World Wide Web format such as HTML." |

---

[14] This term appears in claims 1, 2, 7, and 8 of the '077 patent.

18

| Court |
| --- |
| "an instance of accessing, authenticating, and extracting data from at least one listed Internet site" |

The parties disagree about whether the claim term is indefinite.  A claim is indefinite if it fails to give a person of ordinary skill in the art reasonable certainty as to its meaning.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).  Patent "claims themselves provide substantial guidance as to the meaning of particular claim terms." *Vitronics Corp v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 2006).

The term "gathering cycle" first appears in claim 1 of the '077 patent.  That claim states that the claimed "Portal accomplishes a gathering cycle by accessing individual ones of the Internet sites, authenticating too [sic] each site, and the gathering agent dedicated to each site extracts data from the site." '077 patent col. 18:11-14.  One of skill in the art would be reasonably certain from this claim language that a "gathering cycle" consists of a single instance of accessing, authenticating, and extracting data, and doing so from "individual ones of the Internet sites." '077 patent col. 18:11-14.  The term "the Internet sites" refers to sites on the "list of addresses of Internet sites associated with a specific person, which sites store information specific to the person." '077 patent col. 18:4-6.  The Portal must access at least one site in order to complete a gathering cycle.

Therefore, the Court finds that "gathering cycle" is not indefinite and is properly construed as "an instance of accessing, authenticating, and extracting data from at least one listed Internet site."

7.    **"end user"**[15]

| Yodlee |
|---|
| For the phrases "accessible by the end user"/"access by the selected end user," Yodlee proposes "end user or an intermediary authorized by an end user" |
| **Plaid** |
| "the natural person to whom the information relates" |
| **Court** |
| "the natural person to whom the information relates" |

The parties have two disagreements about the appropriate construction of this term. First, they disagree about whether the term "end user" is used consistently throughout the patent. Second, they disagree about whether an "end user" must be a natural person.

In each of the asserted claims of the '783 patent, the term "end user" appears in two different contexts: (i) in the phrase "non-public personal information relating to an end user" and (ii) in describing information as "accessible by the end user" or as stored for "access by the end user." The parties do agree that, as used in the context of the phrase "non-public personal information relating to an end user," the term "end user" refers to "the person to whom the non-public information relates." Plaid believes that this construction is appropriate for every instance of "end user" in the patent claim. Yodlee counters that the term has a different meaning in the "accessible by" terms, urging the Court to find that in those terms "end user" may refer to either the end user himself or to an intermediary whom the end user has authorized to access the end user's information.

A patentee's use of identical language throughout a claim typically indicates that the patentee intended to imbue the language with the same meaning throughout the claim. *See*

---

[15] This term appears in claims 1, 6, 13, 18-20, 25, and 31 of the '783 patent.

*Process Control Corp. v. HydReclaim Corp*, 190 F.3d 1350, 1356 (Fed. Cir. 1999). Yodlee asks

the Court to depart from this general principle. In support of its proposed construction, Yodlee

cites preferred embodiments in which a user accesses information or data delivered by the

processor through an intermediary web site or application. (D.I. 76 at 12) Even assuming that

these embodiments are within the scope of the claims, this fact would not require the Court to

adopt Yodlee's construction. The plain language of the "accessible" terms merely requires that

the "end user" – the person to whom the information relates – have access to the information.

*See* '783 patent col. 17:5-6 (requiring that processor "store the retrieved personal information

. . . for access by the selected end user"). The claims do not expressly require that the end user

access the information in a particular way (*e.g.* directly, rather than through an intermediary).

Because the end user has access to the end user's information in each of the cited embodiments,

each embodiment falls within the scope of the claims even if "end user" is consistently construed

throughout the claims as "the person to whom the non-public information relates."

The parties' remaining dispute is whether the "end user" to whom the information relates

must be a "natural person." The specification describes "personal information" as "all of the data

that companies . . . have that is specific or unique to each person, such as monthly bills, bank

account balances, investments information, health care benefits, email, voice and fax messages,

401(k) holdings, or potentially any other information pertinent to a particular end user." '783

patent col. 4:15-21. The patent also describes other types of end user information that the

claimed system might aggregate, such as the end user's "name, address, and social security

number." 783 patent col. 5:67-6:4. The patent adds that, at the time of filing, end users obtained

end user information by "checking one place – the mailbox at the end of the driveway." '783

21

patent col. 4:8-12.  The Court concludes that the "end user" of the patent's claims is a natural

person.

       **8.**      **"protocol for instructing the processor how to access the securely stored personal information via the network"**[16]

| **Yodlee** |
| --- |
| "software script detailing the steps necessary for instructing the processor how to login to a specific information provider as the end user and return requested information via the network" |

| **Plaid** |
| --- |
| "The provider data including specific step-by-step instructions directing how to access the securely stored personal information via the network." |

| **Court** |
| --- |
| "software script for instructing the processor how to access the securely stored personal information via the network" |

       The parties' dispute centers on whether the claimed protocol necessarily consists of a

"software script."  The Court agrees with Yodlee that, because the processor is a computer

processor, and the processor "uses the protocol," the protocol must necessarily consist of a

software script.  (D.I. 85 at 10)  Having construed the "protocol" of this claim term as a

"software script," it is unnecessary to construe the remaining language of this term.

---

[16] This term appears in claims 1, 18, and 20 of the '783 patent.

9.    **"personal information store" / [the processor storing the retrieved personal
       information in a] personal information store [for access by the selected end
       user]"[17] [storing the retrieved personal information in a] personal
       information store"[18] "a personal information store [for storing personal
       information associated with each end user retrieved from the information
       providers]"[19] [storing the retrieved personal information in the] personal
       information store [for accessible to the selected end user]"[20]**

| Yodlee |
|---|
| "personal information store" is "one or more storage areas accessible by a processor that contains an end user's personal information" |

| Plaid |
|---|
| "The processor storing the personal information retrieved from multiple sources in a separate section of memory that associates all information about a specific person together using a personal identifier for the end user so that the end user can directly access his or her personal information in a separate section of memory" |

| Court |
|---|
| "storage area for storing the personal information about the end user that the processor has retrieved from one or more information providers" |

The specification and claims of the '783 patent consistently describe a "personal

information store" as a storage area that receives personal information about an end user from a

processor. In each of the asserted claims, the processor is described as "storing . . . retrieved

personal information" after retrieving that information from "one or more information

providers." It is further evident from the claims that a "personal information store" refers to the

storage area for personal information about a particular end user. *See, e.g.*, '783 patent col. 17:4-

6 (describing personal information store as "store *for access by* the selected end user") (emphasis

---

[17] This term appears in claim 1 of the '783 patent.

[18] This term appears in claim 18 of the '783 patent.

[19] This term appears in claim 20 of the '783 patent.

[20] This term appears in claim 20 of the '783 patent.

added).  Therefore, the Court construes "personal information store" as "storage area for storing the personal information about the end user that the processor has retrieved from one or more information providers."

Plaid would have the Court read into the "personal information store" term additional limitations, but none are warranted.  Although Plaid acknowledges that a personal information store may be implemented in a variety of ways, Plaid nonetheless asserts that each implementation requires the use of a "personal identifier for the end user so that the end user can directly access his or her personal information."  However, as the Court discussed in connection with the "end user" dispute, the Court does not agree that the claims are limited to embodiments that provide "direct access to the end user."  Further, Plaid has failed to persuade the Court that a "personal identifier" is necessary for accessing personal information from a personal information store (whether by the end user or otherwise).  Finally, there is no basis in the record to adopt Plaid's requirement that each end user's personal information be stored in a "separate section of memory."[21]

10.     "provider store"[22]

| Yodlee |
| --- |
| "one or more storage areas accessible by a processor that contains the protocol information needed to contact the information providers" |
| **Plaid** |
| Claim 3 is indefinite; no construction is needed for the other terms. |

---

[21]Yodlee acknowledges that the invention requires that one end user not be able to gain unauthorized access to the personal information of another end user.  (*See* Tr. at 92)  There is no basis in the record to support a conclusion that this result may only be accomplished by providing a "separate section of memory" for each end user's information.

[22] This term appears in claims 3, 20, and 22 of the '783 patent.

| Court |
| --- |
| "storage area for information provider data" |

As a preliminary matter, the Court must determine whether Claim 3 is indefinite. Claim 3, which depends from claim 1, refers to "updating the provider store to conform with the requirements of the information provider." *See, e.g.,* '783 patent col. 17:9-11. However, claim 1 does not refer to a "provider store."

A failure to provide antecedent basis does not necessarily render a claim indefinite. *See Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006). If, "despite the absence of explicit antecedent basis . . . the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite." *Id*. at 1370-71 (internal quotation marks omitted); *see also Nautilus*, 134 S. Ct. at 2129 (holding that claims are not indefinite if, "viewed in light of the specification and prosecution history, [they] inform those skilled in the art about the scope of the invention with reasonable certainty"). Thus, Plaid must prove by clear and convincing evidence that the lack of antecedent basis leave one of ordinary skill in the art unable to discern the boundaries of the claim "based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art." *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011) (internal quotation marks omitted).

Here, the Court finds that the specification provides sufficient context to save claim 3 from indefiniteness despite the lack of antecedent basis for the term "provider store." The "Summary of the Invention" explains that a system for implementing the claimed method requires a "provider store including information provider data." '783 patent col. 17:20-24. Claim 1 describes the use of a processor to retrieve "information provider data" that is associated

25

with the connected one or more information providers. `783 patent col. 17:56-61. A person having ordinary skill in the art would understand with reasonable certainty that the "provider store" of claim 3 stores the "information provider data" of claim 1, and thus would further understand that "updating the provider store" refers to "updating the information provider data." Therefore, with respect to claim 3, "provider store" is construed to mean "storage area for information provider data." The claim term has the same meaning as used in claims 20 and 22. *See generally Process Control*, 190 F.3d at 1356.

### 11. "formatted web elements"[23]

| Yodlee "formatted data understood by a web browser" |
| --- |
| Plaid "Edited sections of HTML code" |
| Court "formatted data understood by a web browser" |

The term "formatted web elements" appears in dependent claims that add a limitation of outputting data via a world wide web site. `783 patent col. 17:28-29, *id*. col. 19:22-24. The specification discloses different embodiments of the claims in which a world wide web site is used to deliver personal information. In some embodiments, data is delivered from the processor to an intermediary web site, and that intermediary web site then formats the data into code that can be understood by a web browser. `783 patent col. 12:12-28. In other embodiments, the claimed system incorporates that data into web code that can be understood by a web browser. *See, e.g.*, `783 patent col. 13:30-34. The term "formatted web elements" refers to such code,

---

[23] This term appears in claims 11 and 30 of the `783 patent.

which Yodlee correctly describes as "formatted data understood by a web browser."

The parties disagree about whether these formatted web elements must be written in HTML language. Plaid's contention that they must be is based on an example in the specification, which consists of HTML code. (D.I. 74 at 16) It would be improper "to limit the claims to [a] single disclosed embodiment absent a clear expression of intent to [so] limit the claims' scope." *Info-Hold, Inc. v. Applied Media Techs. Corp.*, 783 F.3d 1262, 1265 (Fed. Cir. 2015). No such expression of such intent can be discerned in the record.

12.  **"end user data including information identifying the plurality of information providers securely storing the personal information relating to the end user"**[24] **"user store [for storing end user data associated with each user, the user store including information identifying the plurality of information providers securely storing the personal information relating to the end user]"**[25]

| Yodlee |
| --- |
| Claims 1, 18: "verification data for a given end user needed to access one or more configured information providers"<br><br>Claim 20: "one or more storage areas accessible by the processor containing verification data for a given end user needed to access one or more configured information providers" |

| Plaid |
| --- |
| "For a specific natural person, a system maintains an entry for that person, associates at least two entries of user-selectable addresses of Internet sites to that person-specific entry, and enables the person to select those addresses to visit the associated destinations, where each of the at least two entries of addresses of Internet sites stores personal information relating to that person." |

| Court |
| --- |
| "including": "including at least"<br><br>"end user": as previously construed as "the natural person to whom the information relates" |

---

[24] This term appears in claims 1 and 18 of the '783 patent.

[25] This term appears in claims 20 of the '783 patent.

The *CashEdge* Court construed the "user store" portion of this term, adopting Yodlee's proposed construction: a "storage component accessible by a processor containing verification data and information identifying information providers that house personal information for a given end user." *CashEdge*, 2006 WL 1883342, at *11. Although Plaid has argued that collateral and judicial estoppel apply, the Court disagrees, for the reasons already given above. Among other things, Plaid asks the Court to construe larger terms than just the "user store" term that was considered by the *CashEdge* Court. Additionally, issues have arisen in this case that were not presented in the earlier case.

Turning to the appropriate construction, the Court has already construed "end user" with respect to claims 1, 18, and 20, and accords the same meaning to "end user" in the longer terms now being addressed. The only remaining dispute the Court must resolve is the meaning of "including." The Court finds that the claims and specification support a construction of "including" as "including at least." The claims refer to a user store "including" data that identifies the information providers that store information about the end user, and the specification discloses embodiments of the claimed invention that include additional information such as "configuration and verification information concerning particular end users." '783 patent 5:3-8. Thus, the combination of the claims and specification indicates that "including," as used in the claims, means "including at least."

13.    **"[defining component tasks based on] pre-programmed client-related data [by software executing on the Internet-connected subscription server]"**[26]

| |
|---|
| **Yodlee**<br>"client-related data stored by the method prior to defining component tasks" |
| **Plaid**<br>"The software on its own determining which component tasks need to be completed based on the client's parameters, rather than using pre-determined component tasks" |
| **Court**<br>"client": plain and ordinary meaning<br><br>"client-related data stored by the method prior to defining component tasks": "using software executing on the Internet-connected subscription server to define component tasks based on client-related data provided to the software prior to the sign-in component task" |

The parties disagree about whether the term "client" (as used in this and the subsequent term) must refer to a natural person. The Court finds that it does not. The ordinary meaning of "client" encompasses both natural persons and entities. The patent does not explicitly define "client" or "data" in a way that disavows clients who are not natural persons. Hence, "client" is construed to encompass the full scope of its plain and ordinary meaning. *See Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015).

The remainder of this claim term is, as the parties suggest, potentially confusing to a jury; the Court will construe the term to clarify the meaning the parties agree it would have to one of ordinary skill in the art. First, the parties agree that the claim term requires the ***use of software*** to define component tasks. (D.I. 74 at 19; D.I. 85 at 14)  Second, the parties agree that the software must define component tasks based on client-related data provided to the software before the time when the software begins to define the component tasks. (D.I. 76 at 20; D.I. 84 at 15)

---

[26] This term appears in claim 8 of the '451 patent.

29

Finally, the parties agree that the client-provided data must influence the tasks that the software defines – that is, that the software must define component tasks "based on" that client data.  (D.I. 74 at 19; D.I. 76 at 20)

### 14.    "communicating the final results to the client at the client station"[27]

| **Yodlee** |
| "sending the integrated results to the client at an Internet-connected device" |
| **Plaid** |
| "Sending to the computer of the natural person who requested completing of the multi-component task the synthesized overall outcome of the multi-component task." |
| **Court** |
| "final results": "integrated results" <br><br> "client station": "Internet-connected device" <br><br> "client": plain and ordinary meaning |

The parties disagree about the meaning of "final results."  The claims recite "gathering and integrating results of component tasks . . . and communicating final results" to the client.  It is clear that the "final results" are the integrated results of the component tasks.

The parties also disagree about the meaning of "client station," and particularly whether it is necessarily a "computer."  Claim 8 does not make clear what a "client station" must be.  The specification helps: in each of the 12 instances in which "client station" is used it is modified by the adjectival phrase "[I]nternet-capable" or "[I]nternet-connected" or instead refers to an antecedent "client station" modified by one of those two phrases.  Moreover, the method of claim 8 mirrors the system of claim 1, which comprises an "internet-capable" client station.  Therefore, the Court concludes that a "client station" must be Internet-connected.

---

[27] This term appears in claim 8 of the '451 patent.

The specification further makes clear that the claimed client station is not limited to a personal computer. For example, the specification explains that, in at least one embodiment, the "client station" may consist of either an Internet-connected personal computer or another "Internet-capable device . . . such as a notebook computer, a WEB TV, [or a] hand-held device[]." '451 patent col. 4:39-52.

15.     **"client profiles [. . . including data relative to information destinations on the Internet for a specific client]"**[28]

| **Yodlee** |
| --- |
| "one or more storage areas storing information associated with a subscriber data request" |
| **Plaid** |
| "For a specific natural person, a system maintains an entry for that person, associates at least two entries of user-selectable addresses of Internet sites to that person-specific entry, and enables the person to select those addresses to visit the associated destinations, where each of the at least two entries of addresses of Internet sites stores personal information relating to that person." |
| **Court** |
| Plain and ordinary meaning. |

The claims state what a "client profile" "include[s]." The Court finds no basis in the specification or claims for further limiting the term. Therefore, "client profiles" is given its plain and ordinary meaning and it is unnecessary to construe this claim term.

16.     **"transmitting the information [for the client device for presentation in the format compatible with the other than a format for an Internet browser application] according to the client profiles"**[29]

| **Yodlee** |
| --- |
| "transmitting the information . . . in conformity with the client profiles" |

---

[28] This term appears in claim 20 of the '548 patent.

[29] This term appears in claim 20 of the '548 patent.

| Plaid |
|-------|
| "Transmitting the information in a transmission format defined by the client profiles." |
| **Court** |
| "transmitting the information for the client device. in this translated format, according to the client profiles" |

The parties disagree about what is being modified by the claim term "according to client profiles." To resolve this dispute. the Court evaluates the disputed term in the context of the entire claim and "in accordance of the precepts of English grammar." *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983).

The "format" portion of the disputed claim term has antecedent basis in earlier claim elements (b) and (c). Element (b) recites accessing "information from Internet destinations in a first format." '548 patent col. 16: 25-26. Element (c) recites "translating" the information to a second "format" that is "compatible with an application other than an Internet browser." '548 patent col. 16: 27-29. Element (d) recites transmitting the information "for presentation in *the* format compatible with *the* other than a format for an Internet browser application." '548 patent col. 16: 27-29 (emphasis added). The patentee's use of the article "the," combined with its repetition of the language "compatible with . . . other than . . . an Internet browser," indicates that the "format" to which element (d) refers is the "translated" format of element (c). Thus, the term "for presentation in the format compatible with the other than a format for an Internet browser application" means "in this translated format."

Although, as Plaid points out, the format defined in element (c) may initially be selected based on client records. the words "according to client profiles" do not modify the word "format" in element (d). Because element (c) defines the "format" of element (d), it would be superfluous

32

to further elaborate that this format was determined "according to client profiles." Therefore, the Court concludes that the words "according to client profiles" modify the other words of the claim term, namely "transmitting the information for the client device."

Combining these two constructions, the Court construes the disputed term as "transmitting the information for the client device, in this translated format, according to the client profiles."

17.   **"translating the information into a format compatible with an application, other than an Internet browser application, executable on the client device"**[30] **"transforming the record into a second data form specific to an application other than an Internet browser application, the application executable by a digital appliance operated by the client connectable server"**[31]

| Yodlee |
| --- |
| '548 patent: Plain and ordinary meaning or "translating the information into an intermediary format capable of translation into a device specific format" <br><br> '520 patent: "a second data format designed for an application other than an Internet browser application" |
| **Plaid** <br> Indefinite; or "Translating the information into a file format executable by an application operating on a digital appliance, where the file format is one that is not compatible with an Internet browser application that was available as of September 16, 1999." |
| **Court** <br> "format compatible with an application, other than an Internet browser application": "format compatible with at least one application that is not an Internet browser application" <br><br> "form specific to an application other than an Internet browser application": "designed for an application that is not an Internet browser application" |

The parties disagree as to what requirements are imposed by the "compatible with" and

_____

[30] This term appears in claim 20 of the '548 patent.

[31] This term appears in claim 21 of the '520 patent.

"specific to" limitations of the '548 and '520 patents.  Yodlee asserts that these limitations

simply require that the forms or formats be compatible with applications other than Internet

browser applications.  Plaid argues that the formats must be compatible *only with* non-browser

applications.

The Court agrees with Yodlee.  Nothing in the plain language of the claims requires that

the recited forms or formats be incompatible with Internet browser applications, provided that

they are also forms or formats that are compatible with an application other than an Internet

browser application.  This reading of the claims is supported by the specification, which states

that the invention "does not *require*" the use of an Internet browser.  ('548  patent col. 11:17-29

(emphasis added); *see also* D.I. 74 M at 12 (prosecution history))

The claims are also not indefinite.  One of ordinary skill in the art would have reasonable

certainty as to their meaning, consistent with the construction the Court has adopted.  The Court

rejects Plaid's contention that if the claims are to be salvaged from indefiniteness the Court must,

at a minimum, freeze the Internet browser compatibility analysis to a POSA's understanding of

what was Internet browser compatible on September 16, 1999.

18.   **"transmitting the information for the client device for presentation"**[32]
      **"transmitting the transformed record to the digital appliance for display"**[33]

| Yodlee |
| --- |
| "outputting for direct or indirect delivery" |

| Plaid |
| --- |
| "Transmitting the information with an address of the digital appliance that will display the information so that the information is provided directly to the digital appliance" |

---

[32] This term appears in claim 20 of the '548  patent.

[33] This term appears in claim 21 of the '520  patent.

**Court**
"outputting for direct or indirect delivery"

The parties agree about the plain and ordinary meaning of the term.  At the hearing, both

parties acknowledged that "transmitting" refers to sending a client record from the place where

the record was transformed to a client device that displays the information.  (Tr. at 121, 124)  The

parties also agreed that the transmission could occur directly (*i.e.*, from where it was transformed

to the device) or via an intermediary.  (Tr. at 121-23)  The Court agrees with the parties on these

points.  Neither the claim language nor the patent specification precludes transmission via an

intermediary.  Indeed, the patent specification discloses embodiments in which information is

transmitted to its final destination via a multi-step path. *See, e.g.,* '548 patent Fig. 1; col. 6: 6-

18.

Yodlee's proposed construction. "outputting for direct or indirect delivery," captures the

plain and ordinary meaning of "transmitting."  In adopting Yodlee's construction. the Court is

not intending to read out the remaining portions of the claim terms addressed in this section (e.g.,

"for presentation" "for display").

The Court is not persuaded to add into the claims the additional limitations proposed by

Plaid: that the transmitted information must be transmitted "within [the] address" of the digital

device that will display the information.  The specification discloses embodiments in which

information is delivered using an address, but there is no clear intent to exclude or disavow from

the claim scope embodiments that do not do so.

19. **"a collection function automatically navigating to and retrieving transaction information associated with a specific person or enterprise from third-party Internet-connected web sites and gathering information concerning transactions"[34] "automatically navigating to and retrieving transaction information associated with a specific person or enterprise from third-party Internet-connected web sites and gathering information concerning transactions by a collection function of the proprietary software said information"[35] "a collector function of the software, the collector function navigating to one or more network information sites and retrieving therefrom financial transaction information regarding the expenditures associated with a specific person or enterprise"[36] "navigating to one or more network information sites by a collector software function executing from memory of an Internet-connected server and retrieving therefrom financial transaction information regarding expenditures associated with a specific person or enterprise"[37]**

| |
|---|
| **Yodlee** |
| "software capable of navigating to a third-party web site and gathering from the third-party web site transaction information associated with a specific person or enterprise" |
| **Plaid** |
| "Software that collects a natural person's transaction information from two or more websites, where for each website it parses a web page rendered by a browser after the web page is retrieved from a website. A website is a set of content to be rendered by a web browser to generate human-readable web pages served by a Web server in a World Wide Web format such as HTML." |
| **Court** |
| "collection function" and "collector function": "software component that uses a site-specific script and/or site-specific data to extract data values from an Internet site based on the site's logic and structure" |
| "web sites" ('535 patent): "two or more web sites" |

The parties agreed at the hearing that the terms "collection function" and "collector

---

[34] This term appears in claim 1 of the '535 patent.

[35] This term appears in claim 6 of the '535 patent.

[36] This term appears in claim 1 of the '515 patent.

[37] This term appears in claim 7 of the '515 patent.

36

function" are synonymous with the term "gatherer" of the '077 patent. (Tr. at 137-39) The parties also agreed that a collection/collector function may collect information about a "person or enterprise." (*Id.*) The Court thus adopts the same construction for "collection/collector function" as it did for "gatherer" and, therefore, will not include Plaid's "natural person" limitation in its construction.

The parties' only remaining dispute relates to whether the collection/collector function must navigate to more than one web site. The Court's conclusion on this dispute is different for the two patents-in-suit. The '535 patent refers to navigation to "web sites." The plain meaning of this plural language requires navigation to two or more sites, and the Court construes the term accordingly. Conversely, the '515 patent requires navigation to "one or more network information sites." This language unambiguously permits navigation to just one web site, and the Court's construction reflects this conclusion.

## III.   CONCLUSION

The Court construes the disputed terms as explained above. An appropriate Order follows.