## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

YODLEE, INC.,         )
        )
    Plaintiff,     )
        )
    v.         )     Civil Action No. 14-1445-LPS
        )
PLAID TECHNOLOGIES INC.,     )
        )
    Defendant.     )

### REPORT AND RECOMMENDATION

Presently pending before the Court is a "Motion to Dismiss for Failure to State a Claim" under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion"), filed by Defendant Plaid Technologies Inc. ("Defendant" or "Plaid"). (D.I. 11) Defendant argues that Plaintiff Yodlee, Inc.'s ("Plaintiff" or "Yodlee") asserted patents are directed to non-patent-eligible subject matter pursuant to 35 U.S.C. § 101 ("Section 101"). For the reasons that follow, the Court recommends that Defendant's Motion be GRANTED-IN-PART, in the manner further described below.

## I. PROCEDURAL BACKGROUND

Yodlee commenced this patent infringement action on December 1, 2014. (D.I. 1) Chief Judge Leonard P. Stark thereafter referred the case to the Court to resolve any and all matters with regard to scheduling, as well as any motions to dismiss, stay and/or transfer venue. (D.I. 7) Plaid filed the instant Motion in lieu of answering on January 23, 2015, and briefing was completed on March 6, 2015. (D.I. 20) The Court held oral argument on the Motion on May 4, 2015. (D.I. 61 (hereinafter, "Tr.")) The next day, the Court ordered that Plaid submit a letter responding to new cases cited by Yodlee during oral argument; Plaid submitted that letter on

May 6, 2015. (D.I. 24)

Plaid moved to stay the case pending resolution of the instant Motion, (D.I. 30), a request

the Court denied on July 20, 2015, (D.I. 51). Thereafter, Chief Judge Stark held a *Markman*

hearing on November 17, 2015, and issued a Memorandum Opinion on claim construction on

January 15, 2016. (D.I. 96) Trial is scheduled for March 2017. (D.I. 26)

## II.     STANDARD OF REVIEW

### A.     Standard of Review Regarding a Rule 12 Motion that Challenges Patent Eligibility Pursuant to Section 101

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on

the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The

sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8,

which requires "a short and plain statement of the claim showing that the pleader is entitled to

relief[.]" Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss pursuant to Rule

12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal

quotation marks and citation omitted). In assessing the plausibility of a claim, the court must

"construe the complaint in the light most favorable to the plaintiff, and determine whether, under

any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC*

*Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted).

Here though, this Motion filed pursuant to Rule 12(b)(6) is used to assert an affirmative

defense—that the patents are subject matter ineligible under Section 101. In that scenario,

dismissal is permitted only if the well-pleaded factual allegations in the Complaint, construed in

2

the light most favorable to the plaintiff, suffice to establish the defense. *See Jones v. Bock*, 549

U.S. 199, 215 (2007); *Bristol-Myers Squibb Co. v. Merck & Co., Inc.*, Civil Action No. 15-560-

GMS, 2016 WL 1072841, at *1 n.1 (D. Del. Mar. 17, 2016); *Genetic Techs. Ltd. v. Agilent*

*Techs., Inc.*, 24 F. Supp. 3d 922, 927 (N.D. Cal. 2014).

      Patentability under Section 101 is a "threshold inquiry" and a question of law. *In re*

*Bilski*, 545 F.3d 943, 950-51 (Fed. Cir. 2008), *aff'd, Bilski v. Kappos*, 561 U.S. 593 (2010). Yet

this question of law is also one that "may be informed by subsidiary factual issues." *CyberFone*

*Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012) (citing *In re Comiskey*, 554

F.3d 967, 976 (Fed. Cir. 2009)). Some members of the United States Court of Appeals for the

Federal Circuit have suggested that "any attack on an issued patent based on a challenge to the

eligibility of the subject matter must be proven by clear and convincing evidence[,]" *CLS Bank*

*Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1304-05 (Fed. Cir. 2013) (Rader, J., concurring-in-

part and dissenting-in-part), but at least one other member of that Court has come to the opposite

conclusion, *see Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 720-21 (Fed. Cir. 2014) (Mayer,

J., concurring), all of which has led to some uncertainty regarding the appropriate standard of

proof in Section 101 cases, *see Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d

371, 379-80 (D. Del. 2015) (citing cases). However, even to the extent that the "clear and

convincing" standard of proof is applicable to Section 101 challenges, it would apply only to the

resolution of factual disputes, and not to resolution of pure issues of law. *See TriPlay, Inc. v.*

*WhatsApp Inc.*, Civil Action No. 13-1703-LPS, 2015 WL 1927696, at *5 (D. Del. Apr. 28, 2015)

(citing cases), *adopted in all substantive respects*, 2015 WL 4730907 (D. Del. Aug. 10, 2015).[1]
And as to the instant Motion, which was filed at the pleading stage (a stage at which any facts
that are clearly in dispute are to be construed in the light most favorable to the plaintiff), the
"clear and convincing" standard of proof should not come into play at all.[2]

### B.   Need for Claim Construction

Although there is no hard-and-fast rule that a court must construe terms in the claims at
issue before it performs a Section 101 analysis, it will ordinarily be desirable (and often
necessary) to do so. *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d
1266, 1273 (Fed. Cir. 2012). When a Rule 12 motion is filed on Section 101 grounds, one
possible path for a court is to wait to resolve the motion until after claim construction has been
decided. *See, e.g.*, *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 835
(E.D. Tex. 2014) (Bryson, J., sitting by designation) (noting that "the Court has waited until after
the claim construction hearing in this case to rule on the present motion in order to ensure that
there are no issues of claim construction that would affect the Court's legal analysis of the
patentability issue"); *cf. CertusView Techs., LLC v. S & N Locating Servs., LLC*, 111 F. Supp. 3d

---

[1]      *See also 01 Communique Lab., Inc. v. Citrix Sys., Inc.*, — F. Supp. 3d —, 2015
WL 9268913, at *6 (N.D. Ohio Dec. 21, 2015); *Listingbook, LLC v. Mkt. Leader, Inc.*, — F.
Supp. 3d —, 2015 WL 7176455, at *5-6 (M.D.N.C. Nov. 13, 2015); *Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, No. 6:15-CV-0029-WSS-JCM, 2015 WL 3757497, at *5 (W.D. Tex. June 12, 2015).

[2]      *See Blue Spike, LLC v. Google Inc.*, Case No. 14-cv-01650-YGR, 2015 WL
5260506, at *4 (N.D. Cal. Sept. 8, 2015); *Shortridge v. Found. Constr. Payroll Serv., LLC*, Case
No. 14-cv-04850-JCS, 2015 WL 1739256, at *7 (N.D. Cal. Apr. 14, 2015); *Modern Telecom Sys.
LLC v. Earthlink, Inc.*, No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7-8 (C.D. Cal. Mar.
17, 2015); *cf. Modern Telecom Sys. LLC v. Lenovo (United States) Inc.*, Case No.: SA CV 14-
1266-DOC (JEMx), 2015 WL 7776873, at *5 (C.D. Cal. Dec. 2, 2015).

688, 704-05 (E.D. Va. 2015).

The Court chose this path here. That decision was prompted in part by a desire to have as full an understanding as possible of the meaning of key claim terms before resolving the Motion. But it was also driven by the notable breadth of Plaid's Motion. At the time that the Motion was filed, Plaid was seeking the dismissal of all 162 claims of all seven patents-in-suit. That kind of a request, in a case with this many patents and claims at issue, sought a huge early investment of judicial resources—resources that might need to be re-invested at the summary judgment stage (if, for example, the Rule 12 Motion was not well taken as to some or all patents-in-suit). In the Court's view, under the weight of that request, the best practicable path was to first obtain the District Court's decision on claim construction before rendering a decision on the instant Motion—thus narrowing the scope of possible outstanding legal issues that might be relevant to Plaid's Section 101 affirmative defenses.

Although this approach had its costs (including that it delayed resolution of the Motion until a much later stage of the case), it also had its positive aspects. As will be further discussed below, Chief Judge Stark's *Markman* opinion did guide the Court's analysis as to a number of the representative claims discussed herein. And, as will also be seen below, delaying resolution of the Motion dramatically cut down on the need for the Court to assess the eligibility of large swaths of dependent claims that ended up not being asserted in the litigation.

### C.   Considerations Relevant to Deciding a Rule 12 Motion that Challenges the Eligibility of Multiple Patent Claims, Based on the Analysis of a Single Representative Claim

In *Cronos Techs., LLC v. Expedia, Inc.*, C.A. No. 13-1538-LPS, 2015 WL 5234040 (D. Del. Sept. 8, 2015), Chief Judge Stark noted "several considerations relevant to deciding a Rule

5

12 motion that challenges the patent eligibility of multiple patent claims based on analysis of a single representative claim." 2015 WL 5234040, at *2. The District Court set out these considerations as follows:

> First, are all non-representative claims adequately represented by the representative claim (i.e., do *all* of the challenged claims relate to the *same* abstract idea and do any of the non-representative claims add one or more inventive concepts that would result in patent eligibility)? Second, are there issues of claim construction that must be decided before resolving the motion? Finally, is there *any* set of facts that could be proven relating to preemption, questions of patentability, or whether the claims "solve a technological problem," that would result in a determination that one [] or more of the claims are patent-eligible?

*Id.* (citations and footnotes omitted) (emphasis in original); *see also Execware LLC v. BJ's Wholesale Club, Inc.*, C.A. No. 14-233-LPS, 2015 WL 5734434, at *2 (D. Del. Sept. 30, 2015).

### D.    Assessing Patentable Subject Matter

Patent-eligible subject matter is defined in Section 101 of the Patent Act:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101. In choosing such expansive terms "modified by the comprehensive 'any,'" Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980).

Yet while the scope of Section 101 is broad, there is an "important implicit exception [to it]: [l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks and citation omitted); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293

(2012). "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, [because] they are the basic tools of scientific and technological work." *Prometheus*, 132 S. Ct. at 1293 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

The Supreme Court of the United States has also recognized, however, that "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Id.*; *see also Alice*, 134 S. Ct. at 2354. This is because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Prometheus*, 132 S. Ct. at 1293; *see also Alice*, 134 S. Ct. at 2354. To that end, it has explained that "an *application* of a law of nature, [natural phenomena or abstract idea] to a known structure or process may well be deserving of patent protection." *Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (emphasis in original).

In terms of the process used to analyze patent eligibility under Section 101, the Federal Circuit has explained that a court should first identify whether the claimed invention fits within one of the four statutory classes set out in the statute: processes, machines, manufactures, and compositions of matter. *Ultramercial*, 772 F.3d at 713-14. The court must then assess whether any of the judicially recognizable exceptions to subject matter eligibility apply, including whether the claims are to patent-ineligible abstract ideas. *Id.* at 714.[3]

In *Alice*, the Supreme Court confirmed the framework to be used in order to distinguish patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim

---

[3]     There is no dispute in this action that the claims at issue fall into one of the applicable statutory classes. The dispute here is about whether the claims are drawn to patent-ineligible abstract ideas, and so the Court will focus its analysis on that issue.

7

patent-eligible applications of those concepts:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. . . . If so, we then ask, "[w]hat else is there in the claims before us?" . . . To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. . . . We have described step two of this analysis as a search for an "'inventive concept'"—*i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Alice*, 134 S. Ct. at 2355 (quoting *Prometheus*, 132 S. Ct. at 1294-98) (citations omitted; alterations in original); *see also Parker v. Flook*, 437 U.S. 584, 594 (1978). Since *Alice*, the Federal Circuit has recognized that "[d]istinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as the line separating the two is not always clear." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).

## III.    DISCUSSION

As noted above, Yodlee alleges infringement of a total of seven patents, all of which are put at issue by the Motion: United States Patent Nos. 6,199,077 (the "'077 patent"), 6,317,783 (the "'783 patent"), 6,510,451 (the "'451 patent"), 7,263,548 (the "'548 patent"), 7,424,520 (the "'520 patent"), 7,752,535 (the "'535 patent"), and 8,266,515 (the "'515 patent") (collectively, the "asserted patents" or the "patents-in-suit"). (D.I. 1 at ¶ 1) In their briefing, the parties address three of the patents individually, with the remaining patents grouped into two groups of two. The Court will follow that same convention below in resolving the Motion.

At the time of the Motion's filing, Yodlee had not identified the specific claims that it

would be asserting in this action. (*Id.* at ¶¶ 36, 44, 52, 60, 68, 76 & 84)  In both its briefing and during oral argument, Plaid largely focused on one assertedly representative claim per patent for purposes of its Section 101 analysis.[4]  The Court will focus on those claims first, before addressing how to assess the remaining asserted claims in each patent.

### A.    Issues of Fact or Claim Scope Asserted to Preclude a Grant of the Motion

In its briefing and at oral argument, Yodlee asserted that fact and claim construction issues precluded dismissal by way of a Rule 12 motion. (D.I. 15 at 6-7; Tr. at 51)  When the Court below addresses each patent-in-suit, it will take into account any materials it can properly consider, and assess whether asserted factual disputes affect its ability to render a final decision on eligibility under Section 101.[5]  With regard to issues of claim scope, the District Court's

---

[4]    Subsequently, Yodlee narrowed the asserted claims to 21 claims across the patents-in-suit, (*see* D.I. 48, D.I. 131; D.I. 152 at 1), though the Court has not been provided with a list of the claims that are currently asserted.

[5]    In explaining why there are material factual disputes between the parties as to issues relevant to a Section 101 determination, Yodlee relies at times on the declaration of Dr. Sigurd Meldal, which Yodlee submitted along with its answering brief. (D.I. 17)  Dr. Meldal's declaration is no doubt the most prominent example, but both parties frequently cite to documents or data sources that are neither referenced in, attached to, nor integral to the Complaint. (*See, e.g.*, D.I. 12 at 9; D.I. 15 at 11)  The Court cannot see how, in the context of reviewing and resolving a Rule 12(b)(6) motion, it is permitted to take into account the content of these sources (absent the Motion being converted into a motion for summary judgment). *See, e.g., Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (noting that courts faced with a motion to dismiss must generally limit their consideration solely to "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record").  And so, in the absence of a better argument as to how it can do so, (Tr. at 53-54), the Court will not rely on such materials below.  It will instead rely primarily on the content of the patents-in-suit, which can be properly considered, since they were both attached as exhibits to the Complaint and are documents integral to the Complaint. (D.I. 1 & exs. A-G)  Having said this, the Court certainly understands why, for example, Yodlee offered Dr. Meldal's declaration—it was attempting to do all that it could do to explain to the Court why disputed issues of fact exist as to the Motion.  The Court also notes its view that, even were it to have relied upon the content of that declaration, the ultimate outcome of its eligibility decisions

*Markman* decision has provided a significant amount of additional guidance as to the issues raised by the parties.

### B.   Asserted Patents

#### 1.   '077 Patent

##### a.   The Invention

The '077 patent is entitled "Server-Wide Web Summary Generation and Presentation"; it was issued on March 6, 2001. The technology at issue relates to the field of Internet navigation, and more specifically, to methods and apparatus for "gathering summary information from users or enterprise-selected WEB sites and presenting the information as HTML [Hyper Text Markup Language] to the user using either a push or pull technology." ('077 patent, col. 1:16-22)

At the time of the invention, companies offered subscription services accessible through the Internet. (*Id.*, col. 1:36-37) The availability of these subscription services created problems for users, such as where: (1) a user had too many different passwords and/or login codes associated with the various subscriptions; and (2) a user had to bookmark too many different web pages in order to find and access various services quickly. (*Id.*, col. 1:46-2:6)

The specification describes a known service that allowed users to store password-protected pages in one location in order to simplify browsing and gathering information. (*Id.*, col. 2:11-16) A feature of this service was that a software agent could execute tasks based on user instruction. (*Id.*, col. 2:16-19) The service stored user password and login information and used that information to log in to the user's sites; users could navigate the listed sites by clicking on hyperlinks provided in an interactive homepage, without having to manually input the login

---

as to any of the asserted patents would not have been different.

10

information in order to gain access to those sites. (*Id.*, col. 2:21-31) Also included in the service

was a software agent capable of returning specific summaries and updates about user-account

pages. (*Id.*, col. 2:32-35) The software agent could search user-entered Uniform Resource

Locators ("URLs") that were cached in presentable form (such as on the portal server or client's

machine). (*Id.*, col. 2:35-39)

In addition to the features of this known service, the specification discusses the need for

the software agent, in concert with the search function, to be able to navigate to any URL or

group of URLs for the purpose of providing summary information on updated URL content to

the user, in the form of an HTML information-page. (*Id.*, col. 2:40-47) This need, according to

the specification, necessitated a method and apparatus capable of navigating to user-supplied or

known URLs independently, logging in with the appropriate password information at each URL,

and returning a summary of the user-requested information in a human and machine-readable

document. (*Id.*, col. 2:48-53) The patent states that it claims such a method and apparatus. This

resulting system would serve as an effective summarization service that could present important

information without the user having to invoke hyperlinks from a personal portal home page. (*Id.*,

col. 2:53-56) With this invention, the patent states that, for the first time, subscribers to such a

service would be able to quickly access multiple web sites and download data summaries, all

without performing lengthy login procedures. (*Id.*, col. 3:12-17)

In the "Summary of the Invention" section of the patent, the specification describes an

"Internet Portal" (the "Portal"), comprising an Internet-connected server and a portal software

executing on the server, and which includes a summary software agent. (*Id.*, col. 2:59-62) The

Portal maintains a list of Internet destinations specific to a user, and the software agent accesses

11

those destinations, retrieves information based on pre-programmed criteria, and summarizes that

information for delivery to the user.  (*Id.*, col. 2:62-67)

The patent contains two independent claims (claims 1 and 7).  Plaid asserts that claim 7

of the '077 patent is representative.  (D.I. 12 at 8; Tr. at 18)  Claim 7 recites:

> 7.  In an Internet Portal system, a method for gathering data
> specific to a person from a plurality of Internet sites storing data
> specific to that person, the method comprising the steps of:
>
> > (a) initiating a gathering cycle accessing individual ones of
> > the plurality of sites;
> >
> > (b) authenticating to the sites as the person; and
> >
> > (c) executing a software gathering agent at each site
> > accessed to gather data from the site, the gathering agent
> > dedicated to each site accessed.

('077 patent, col. 18:31-40)

### b.    *Alice*'s step one

Under step one of *Alice*, the claims are considered in their entirety to ascertain not simply

whether they *involve* a patent-ineligible concept, but whether "'their character as a whole is

directed to excluded subject matter'" (here, an abstract idea).  *Enfish, LLC v. Microsoft Corp.*, —

F.3d —, 2016 WL 2756255, at *4 (Fed. Cir. May 12, 2015) (quoting *Internet Patents Corp. v.

Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)).  "The 'abstract ideas' category

embodies 'the longstanding rule that [a]n idea of itself is not patentable.'"  *Alice*, 134 S. Ct. at

2355 (quoting *Gottschalk*, 409 U.S. at 67) (certain quotation marks omitted).  An abstract idea

can be, but need not amount to, a "preexisting, fundamental truth" about the natural world "that

has always existed," or a "method of organizing human activity" (such as a "longstanding

12

commercial practice"). *Id.* at 2356 (internal quotation marks and citations omitted); *see also*

*DDR Holdings*, 773 F.3d at 1256-57; *cf. CLS Bank*, 717 F.3d at 1286 (explaining that a claim

directed to an abstract idea is one directed to a "'disembodied concept' . . . a basic building block

of human ingenuity, untethered from any real-world application") (citation omitted).  Beyond

that, the concept of an "abstract idea" has not been crisply defined, *see Alice*, 134 S. Ct. at 2357

(declining to "labor to delimit the precise contours of the 'abstract ideas' category"), and the

Supreme Court and the Federal Circuit have found it sufficient to compare claims at issue to

those claims already found to be directed to an abstract idea in previous cases, *see Enfish*, 2016

WL 2756255, at *4.

Plaid argues that the claims of the '077 patent are directed to the abstract idea of

"gathering data specific to a person from a plurality of Internet sites." (D.I. 12 at 8)  Rephrased,

the claim, according to Plaid, recites "logging into websites and gathering personal data from

them." (*Id.* at 9)  This concept of "[g]athering data from multiple sources[,]" Defendant asserts,

is fundamental and has been practiced by both professionals and computers for years. (*Id.*; *see*

*also* Tr. at 19)[6]

The Court concludes (indeed, it is not really disputed here) that the concept of "gathering

data specific to a person from a plurality of Internet sites," or of "logging into websites and

---

[6]      As can be seen after reading this paragraph, the way that Plaid formulated the
abstract idea at issue shifted at times in its briefing (from "gathering data specific to a person
from a plurality of Internet sites" and "logging into websites and gathering personal data from
them" to the simplified and presumably more "longstanding" concept of "gathering data from
multiple sources").  While the Court considers the first two articulations set out in this paragraph
above to be more appropriate expressions of the abstract idea(s) potentially at issue here (as they
better capture the context of claim 7), it notes that any of the articulations would amount to an
"abstract idea"—a disembodied concept, or basic building block of human ingenuity, untethered
from any real-world application. *See CLS Bank*, 717 F.3d at 1286.

gathering personal data from them" constitute abstract ideas.  These concepts are comparable

with others that courts have found to amount to abstract ideas untethered from real-world

application.  *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776

F.3d 1343, 1347 (Fed. Cir. 2014) (determining claims to be directed to an abstract idea when they

were directed to collecting data, recognizing certain data within the collected data set, and storing

that recognized data in a memory); *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366,

1372-73 (Fed. Cir. 2011) (finding abstract a claim that required "obtaining information about

other transactions that have utilized an Internet address that is identified with the [] credit card

transaction[,]" "construct[ing] a map of credit card numbers" and "utilizing the map of credit

card numbers to determine if the credit card transaction is valid") (internal quotation marks

omitted); *Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP*, 128 F. Supp. 3d 103, 112

(D.D.C. 2015) ("This abstract concept of collecting, recognizing, and storing data is not

patent-eligible.").

The Court next assesses whether claim 7 is "directed to" these abstract ideas.  As to how

that inquiry should proceed, the Federal Circuit provided some guidance in *Internet Patents*

*Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015).  There, in order to ascertain at step

one whether the claims' "character as a whole" was directed to an abstract idea, the *Internet*

*Patents* Court examined the specification of the patent at issue.  In doing so, it cited to what the

patentee had described in the specification as "the innovation over the prior art" and "the

essential, 'most important aspect'" of the patent:  the "end result" of maintaining the data state in

the navigation of online forms.  *Internet Patents*, 790 F.3d at 1348.  The *Internet Patents* Court

ultimately found, however, that the "character of the claimed invention" in claim 1 of the

14

relevant patent was directed to an abstract idea—the "*idea of* retaining information in the navigation of online forms." *Id.* (emphasis added). It so concluded because the "mechanism for maintaining the state [was] not described" in the claim, "although this [was] stated to be the essential innovation." *Id.* As a result, the claim was "directed to the idea itself—the abstract idea of avoiding loss of data." *Id.*

Recently, in *Enfish, LLC v. Microsoft Corp.*, — F.3d —, 2016 WL 2756255 (Fed. Cir. May 12, 2015), the Federal Circuit again addressed the *Alice* step one inquiry in the context of assessing software patents.[7] There, the plaintiff asserted two patents, both of which were directed to a "logical model for a computer database[,]"[8] specifically, a "self-referential" model.[9]

---

[7]     *Enfish* was issued long after oral argument on the Motion was held.  The parties have thus not had the opportunity to brief how the case impacts resolution of the Motion, nor did they file any supplemental notice on the docket addressing the case.  In light of the procedural posture of the Motion, the Court has simply considered relevant guidance from *Enfish* in resolving this Report and Recommendation, without calling for additional briefing.  It does so with the knowledge that to the extent that there are objections to the Report and Recommendation, and that to the extent that those objections relate to the Court's treatment of *Enfish*, the parties can address *Enfish* in their briefing regarding the objections (and could seek permission to have additional pages of briefing in which to do so).

[8]     A logical model is a "model of data for a computer database explaining how the various elements of information are related to one another." *Enfish*, 2016 WL 2756255, at *1.  It results in "the creation of a particular tables of data," but does not otherwise describe how the tables are arranged in physical memory devices. *Id.*

[9]     The "self-referential" model recited in the two asserted patents differed from the traditional "relational" model.  With the "relational model, each entity (i.e., each type of thing) that is modeled is provided in a separate table." *Enfish*, 2016 WL 2756255, at *1.  The "self-referential" model, in contrast, included all the data entities in a single table, with column definitions provided by rows in the same table. *Id.*, at *1-2.  The patents taught that the two defining features of the "self-referential" model—that all relevant information is stored in a single table, and that columns are defined by rows in the same table—allowed for (as compared to other models) faster searching for data within the table, more effective storage of certain data and increased flexibility in configuring the database. *Id.* at *2.

*Enfish*, 2016 WL 2756255, at *1-2. On summary judgment, the district court had found all claims invalid as ineligible under Section 101, and had concluded that the claims were directed to the abstract idea of "'storing, organizing, and retrieving memory in a logical table[,]'" or put another way, "'the concept of organizing information using tabular formats.'" *Id.* at *6.

In reviewing the district court's conclusion, the Federal Circuit assessed the claims at step one of the *Alice* inquiry, and provided additional insight into what the "directed to" inquiry requires. The *Enfish* Court began by stating that *Alice*'s first step is "a meaningful one" and that it can thus be expected "that a substantial class of claims are *not* directed to a patent-ineligible concept." *Id.* at *4 (emphasis in original) (citing *Alice*, 134 S. Ct. at 2355). The Court also stated that, as to patent claims directed to software, it did not think that such claims "are inherently abstract and therefore only properly analyzed at the second step of the *Alice* analysis[]" since "[s]oftware can make non-abstract improvements to computer technology just as hardware improvements can[.]" *Id.* And so, the question the *Enfish* Court sought to answer about the claims at issue was "whether the focus of the claims is on [a] specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at *5.

The Court ultimately found that the "plain focus of the claims" there was on "an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." *Id.* More specifically, it held that the claims were "not simply directed to *any* form of storing tabular data, but instead [were] specifically directed

16

to a *self-referential* table for a computer database." *Id.* at *6 (emphasis in original).[10]  In coming

to this conclusion, the *Enfish* Court explained that the "necessity of describing the claims in such

a way [was] underscored" by:  (1) the specification's emphasis that "'the present invention

comprises a flexible self-referential table that stores data[,]'"; and (2) the specification's teaching

that the self-referential table "functions differently than conventional database structures"—in

that traditional databases were "inferior" to such a table and that such a table "achieves other

benefits over conventional databases[.]" *Id.* at *6 (citations omitted).  The *Enfish* Court ended by

stating:

> In sum, the self-referential table recited in the claims on appeal is a
> specific type of data structure designed to improve the way a
> computer stores and retrieves data in memory.  The specification's
> disparagement of conventional data structures, combined with
> language describing the "present invention" as including the
> features that make up a self-referential table, confirm that our
> characterization of the "invention" for purposes of the [Section]
> 101 analysis has not been deceived by the "draftsman's art." . . . In
> other words, we are not faced with a situation where
> general-purpose computer components are added post-hoc to a
> fundamental economic practice or mathematical equation.  Rather,
> the claims are directed to a specific implementation of a solution to
> a problem in the software arts.  Accordingly, we find the claims at
> issue are not directed to an abstract idea.

*Id.* at *8 (citation omitted).[11]  Thus, the Court held that the claims at issue were patent eligible.

---

[10]     This was reflected, as to a key representative claim (a "means plus function"
claim), in the fact that claim's referenced "means for configuring" language required a four-step
algorithm—and the third step of that algorithm read as follows:  "For each column, store
information about that column in one or more rows, rendering the table self-referential, the
appending, to the logical table, of new columns that are available for immediate use being
possible through the creation of new column definition records." *Enfish*, 2016 WL 2756255, at
*5-6.

[11]     In light of its conclusion that the claims were clearly not directed to an abstract
idea, the Federal Circuit found it unnecessary to continue to step two of the *Alice* test. *Enfish*,

*Id.* at *13.

In light of this precedent, is claim 7 directed to the abstract ideas of "gathering data specific to a person from a plurality of Internet sites," or of "logging into websites and gathering personal data from them"?  The answer is not clear cut.

To be sure, the patent does explain what is said to be the most important aspect of the invention.  The specification states that the "present invention" relates to "methods and apparatus, including software, for gathering summary information from users or enterprise-selected WEB sites and presenting the information . . . ." ('077 patent, col. 1:18-22)  And the specification goes on to make clear that the key aspect of "gathering" technology that was missing from known services—and that was "clearly needed" at the time of the invention—was an apparatus that could use software not only to independently navigate to user-supplied URLs, but also to login with the appropriate password information at each URL.  (*Id.*, col. 2:48-56)  Indeed, in the "Summary of the Invention" of the specification, the patentee said that the system described therein "for the first time" would provide users with the ability to quickly access multiple websites without lengthy log-in procedures, and retrieve data from those websites and provide it to the user.  (*Id.*, col. 3:14-17)

Moreover, reference to most of these "clearly needed" aspects of the invention (all but those relating to summarizing the data and providing it to the user—steps found in later dependent claims) can be found in claim 7.  These are located primarily in steps (b) (discussing

---

2016 WL 2756255, at *8.  The court recognized, however, that "in other cases involving computer-related claims, there may be close calls about how to characterize what the claims are directed to.  In such cases, an analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two." *Id.*

"authenticating" to the sites) and (c) (discussing how the software agent gathers data from the sites) of the claim.

But even if the claim touches on what is asserted to be an improvement to then-existing computer capabilities, can it be said that the components of the claim are such that the claim is directed to a "specific" or "concrete" improvement in the way software operates? *Enfish*, 2016 WL 2756255, at *8. In other words, is it directed to something that gets beyond the mere *idea* of "logging into websites and gathering personal data from them"?

On that score, Yodlee is at least helped a bit by the District Court's construction of a key term in claim 7: the "software gathering agent" found in step (c). Plaid itself realized that this "software gathering agent" term was important to the Section 101 analysis, but asserted that the "gathering agent" was "plainly not limited to any specific algorithm for parsing webpages[,]" and was broad enough to encapsulate "any software that can be employed to locate and retrieve information online." (D.I. 20 at 6 (internal quotation marks and citation omitted); *see also* Tr. at 21, 23) Thus, according to Plaid, the inclusion of this term did not save the claim from ineligibility.

The District Court, however, construed the term "gather[ing] agent" (i.e., the "software gathering agent" at issue in claim 7) to mean: "software component that uses a site-specific script and/or site-specific data to extract data values from an Internet site based on the site's logic and structure[,]" (D.I. 96 at 14), citing in support to portions of the specification that discuss the software "gatherer['s]" use of such a "site-specific" script[,] (*see id.* at 15 (citing '077 patent,

19

cols. 9:54-64, 11:35-55)).[12]  One portion of the specification cited by the District Court further articulates the role that this "site-specific script or template" could play in the invention, noting that:

> Such a [script or] template contains descriptions and locations of the appropriate fields used, for example, at [the website] apartments.com.  Apartment description, location, deposit information, rental information, agent contact information, and other related fields are matched in terms of location and label description on the template . . . .

(*Id.*, col. 11:46-51; *see also id.*, cols. 12:50-13:46)  Thus, instead of encapsulating "*any* software that can be employed to locate and retrieve information online[,]" (D.I. 20 at 6 (emphasis added) (internal quotation marks and citation omitted)), as Plaid asserted, the requisite "software gathering agent" is at least somewhat narrower in scope.  Put differently, the claim does not, as Plaid argued, attempt to "capture [only] software that *somehow* logs into a website and *somehow* gathers data from that website." (*Id.* at 5 (emphasis in original))  It captures software that gathers data from the websites in question through the use of "site-specific" scripts or data that are, in turn, correlated to that particular site's logic and structure (e.g., to the particular fields that the site uses to capture information).  While such a limitation may not describe *all* aspects of how this software agent works, it does provides at least some of the "somehow" that Plaid claimed was missing entirely from the claim.  (*Cf.* Tr. at 16 (Plaid's counsel noting that to survive step two of *Alice*, a claim must set out "some level of *how* that talks about what the computer is actually doing to achieve the result[,] and not just saying, We will achieve the result.") (emphasis

---

[12]     The site-specific nature of the software gathering agent also appears to be highlighted by the claim's requirement that the gathering agent be "dedicated to each site accessed." ('077 patent, col. 18:41)

added))

Even taking into account the inclusion of this amount of particularity, however, the Court

concludes that this is one of those "close calls[,]" discussed in *Enfish*, *see* 2016 WL 2756255, at

*8—a situation where the Court cannot clearly conclude as a matter of law that the claim is

directed to an abstract idea (as opposed to a specific improvement in computer technology).

Therefore, the Court finds that an "analysis of whether there are arguably concrete improvements

in the recited computer technology [should] take place at step two." *Id.*

### c.   *Alice's* **step two**

Even assuming that claim 7 of the '077 patent was directed to Plaid's asserted abstract

idea(s), the claim could still be patent-eligible if it contains an "inventive concept"— an element

or combination of elements that are sufficient to "ensure that the patent in practice amounts to

*significantly more*" than a patent upon an ineligible concept. *Alice*, 134 S. Ct. at 2355 (emphasis

added) (internal quotation marks and citation omitted).  There is no "inventive concept" if a

claim recites only an abstract idea implemented using "generic" technology to "perform well-

understood, routine, and conventional activities commonly used in the industry." *Content

Extraction*, 776 F.3d at 1348.  Neither "limiting the use of an abstract idea to a particular

technological environment[,]" nor simply stating an abstract idea and adding the words "apply

it[,]" will transform an abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2358

(internal quotation marks and citations omitted).

Plaid argued that claim 7 did not contain an inventive concept beyond the asserted

abstract ideas, asserting that all the claimed system does is "limit[] the sources of collection [of

data] to the Internet" through the use of "conventional Internet technology to perform a

21

fundamental task." (D.I. 12 at 10)  This claim, Plaid argues, is "designed to cover an entire

'*approach*' to gathering data," (D.I. 20 at 5 (emphasis in original)), and does not provide a

"particular inventive *way*" to do so, (*id.* (emphasis in original)).  The Court concludes, however,

that there are multiple reasons why the Motion should be denied without prejudice at step two.

      One important reason is the presence of the "software gathering agent" in claim 7.  The

inclusion of this claim element (as construed by the District Court in the manner described

above), renders it more likely that claim 7 could be found to contain an inventive concept similar

to that identified in *DDR Holdings*—a case where the claim made reference to a specific solution

that was "not merely the routine or conventional use" of software interacting with the Internet.

773 F.3d at 1258-59 (finding claims to be subject matter eligible where they "recite[d] *a specific

way* to automate the creation of a composite web page by an 'outsource provider' . . . in order to

solve a problem faced by websites on the Internet"—and where that "specific way" amounted to

a system that directed a visitor to a hybrid webpage, which in turn presented product information

from a third party as well as the visual "look and feel" elements from a host website) (emphasis

added).  Once the automatic authentication process called for by claim 7 is complete, the

software gathering agent automatically gathers and extracts desired information from the target

website through the use of a script or template specific to that target site.  Similar to the

technology at issue in *DDR Holdings*, it appears plausible that such a claim describes "how

interactions with the Internet are manipulated to yield a desired result—a result that overrides the

routine and conventional sequence of events ordinarily triggered by" a user's efforts to log in and

obtain personal information from a website. *Id.* at 1258.[13]

Second, there appear to be disputed issues of fact here that, when resolved, will bear on whether claim 7's method simply performs "well-understood, routine, and conventional activities" commonly used in the relevant industry.  As was previously noted above, the '077 patent itself asserts that the methods described therein were anything but routine and conventional.  (*See* '077 patent, col. 3:14-17)  Moreover, the patent claims that the ability for software to initiate a "gathering cycle" and gather data from a website independent of a user was "clearly needed" at the time of the invention.  (*Id.*, col. 2:53-56)  Further factual development of this subject would allow for a more informed analysis of whether "the patent in practice amounts to *significantly more*" than a patent upon an ineligible concept.  *Alice*, 134 S. Ct. at 2355 (emphasis added) (internal quotation marks and citation omitted).

Third, there is a real factual dispute about the degree to which the claimed system would

---

[13]     Plaid argues that the claim is similar to one found to be patent ineligible in *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011), because, as in that case, the claim at issue here simply "instructs a computer to analyze data as would a human mind" or "in the same way as a human mind would[.]" (D.I. 20 at 5 n.3)  Yet in *Cybersource*, one claim at issue (claim 3) simply implicated a method for verifying the validity of credit card transactions over the Internet; the claim did not require the method to be performed by a particular machine, or even a machine at all.  654 F.3d at 1370.  And the other claim at issue (claim 2), which claimed a "computer readable medium containing program instructions" that used processors to carry out the method at issue, was found not to include an inventive concept because it "recit[ed] nothing more than] the use of a computer to execute an [unspecified] algorithm[.]" *Id.* at 1374-75 ("In the present case, CyberSource has not met its burden to demonstrate that claim 2 is 'truly drawn to a specific' computer readable medium, rather than to the underlying method of credit card fraud detection.").  Here, in contrast, claim 7 at least includes the requirement that, *inter alia*, the requisite software gathering agent uses a site-specific script or template to identify desired information based on the logic and structure of a targeted Internet site.  This is a closer step toward a *specific type* of software/computer program than that provided by the claims in *Cybersource*.  Thus, there is a clear basis for distinguishing the case.

significantly preempt the relevant field of applications for logging into websites and gathering

data that will then be represented to the user, (D.I. 15 at 11-12; D.I. 20 at 5), and as to the impact

of other asserted available methods for such web-based data gathering, (D.I. 15 at 11-12).   At

least one such method—that where a user manually logs into each of her subscription services to

gather such information—is called out in the patent itself.   ('077 patent, col. 1:41-45)[14]   And

Plaid seems to concede that claim 7 would not, at least, preempt all forms of data gathering from

websites.   (D.I. 20 at 6 (though noting that complete preemption is not required in order for a

claim to be subject-matter ineligible); Tr. at 22 (same))   Additional fact-finding as to the scope of

preemption may impact this Court's ultimate conclusion as to whether the elements recited in

claim 7 "would risk disproportionately tying up the use of the underlying ideas[.]" *Alice*, 134 S.

Ct. at 2355 (internal quotation marks and citation omitted).

     For all of these reasons, Plaid has not met its burden to demonstrate that claim 7 of the

'077 patent fails to contain an inventive concept.   Consequently, the Court recommends that the

Motion be denied without prejudice as to that claim.

     **2.**    **'783 Patent**

     **a.**    **The Invention**

     The '783 patent is entitled "Apparatus and Methods for Automated Aggregation and

Delivery of and Transactions Involving Electronic Personal Information or Data."   It was issued

on November 13, 2001.   The patent, as its title suggests, relates to the "automated aggregation

---

[14]    Yodlee cites Dr. Meldal's extra-Complaint declaration for the proposition that at least another such method was promoted at the time of the patent's issuance by a consortium of companies known as the "Open Financial Exchange" or "OFX"—one that required webpage providers, such as financial institutions, to prepare and store each user's financial information for download by the user.   (D.I. 15 at 12; *see also* D.I. 17 at ¶¶ 32, 44-45; Tr. at 60)

and delivery of electronic personal information or data[,]" as well as automating transactions

involving electronic personal information, or "PI." ('783 patent, col. 1:23-26)  The specification

defines PI as all data that companies have and that is specific or unique to a person (such as

monthly bills, bank account balances, e-mail and voicemail messages, and the like).  (*Id.*, col.

4:15-21)

The specification begins by describing the evolution of Internet portals.  It does so by first

explaining that the introduction of search engines in the 1990s provided more user-friendly

navigation tools that eased the workload for end users.  (*Id.*, col. 1:37-44)  As more content was

added to the Internet, users sought better tools to organize and access that content; one such tool

was the use of the "portal strategy[.]"  (*Id.*, col. 1:44-53)  Online content continued to grow, and

at the time of application, portals and other destination sites also faced competitive pressures to

"drive quality [user] traffic to their site and keep it there."  (*Id.*, col. 1:64-66)  One way to retain

traffic was to organize information according to personal preferences and tastes of the user.  (*Id.*,

cols. 1:53-57, 1:66-2:2)  So generic portal sites began allowing users to select and configure

generic PI (i.e., PI of interest to the particular user that does not require specific identity

verification to obtain).  (*Id.*, col. 2:42-59)  The portals, however, did not provide PI requiring

identity verification (such as a user's stock portfolio or bank balance) and could not facilitate

transactions using such information.  (*Id.*, col. 2:59-63)  In order to access information like that,

users were forced to visit provider sites individually, and each of those sites had different

requirements, different graphical user interfaces, and different login protocols.  (*Id.*, cols. 2:66-

3:2)

The patentee sought to overcome the learning curve for navigating the Internet to obtain

25

PI by aggregating both general PI and PI that required identity verification for access. (*Id.*, col. 4:22-26) The claimed invention is described as aggregating user PI on a networked computer and delivering it to the end user in a unified manner through a variety of platforms, and further facilitating a variety of transactions involving user PI. (*Id.*, col. 3:9-19) A system encompassing the claimed invention is described as including a user store (for end user data), provider store (for information provider data), a PI store (for PI), and a processor that communicates with these different stores and supports PI aggregation. (*Id.*, col. 3:20-25) The PI store contains each individual's PI record, separate from all other end users. (*Id.*, col. 4:56-60) The processor accomplishes its functions by first selecting an end user for personal information aggregation, connecting and retrieving information from one or more information providers based on data associated with the selected user, and storing the information in the PI store. (*Id.*, col. 3:26-34)

The patent contains three independent claims (claims 1, 18 and 20) and 33 dependent claims. Claim 1, which Plaid focuses on in its briefing, claims:

> **1.** A method for delivering non-public personal information relating to an end user via a wide-area computer network to an end user from at least one of a plurality of information providers securely storing the personal information under control of a processor located remotely from the information providers and the end user, the method comprising the steps of:
>
> (a) the processor connecting with at least one information provider;
>
> (b) for a selected end user, the processor retrieving personal information for the selected end user from the connected at least one information provider based on end user data associated with the selected end user and information provider data associated with the connected one or more information providers, the end user data including information identifying the plurality of information providers securely storing the personal information relating to the end user, the provider data including a protocol for instructing the

processor how to access the securely stored personal information via the network, the information accessible to the processor using the protocol also being accessible by the end user via the network independently of the system for delivering personal information; and

(c) the processor storing the retrieved personal information in a personal information store for access by the selected end user.

(*Id.*, cols. 16:47-17:6)

### b.    *Alice*'s step one

Plaid contends that the '783 patent is directed to the abstract idea of "retrieving and storing personal information from multiple sources." (D.I. 12 at 2)  The Court agrees that this is an abstract idea.[15]

However, the Court does not believe that Plaid has met its burden to show that claim 1 is "directed to" this asserted abstract idea.  *Internet Patents*, 790 F.3d 1348.  That is because the "idea" identified by Plaid sweeps too broadly, and does not incorporate the key concept in the claim that the patentee calls out as the rationale for the invention.

The specification makes clear that at the time of the patent's issuance, a significant problem with individual portal pages for users seeking to aggregate data on the Internet was that the pages did "not generally provide PI requiring identity verification" (like an end user's bank balance).  ('783 patent, col. 2:57-62)  And so, the patent explains, the "present invention

---

[15]    *See Content Extraction*, 776 F.3d at 1347 (finding "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory[]" to be an abstract idea); *Intellectual Ventures I*, 100 F. Supp. at 383 (concluding that "the steps of collecting, recognizing, and storing data" with the inclusion of an additional step of "communicating a result" was an abstract idea); *cf. YYZ, LLC v. Hewlett-Packard Co.*, Civ. No. 13-136-SLR, 2015 WL 5886176, at *7 (D. Del. Oct. 8, 2015) (finding abstract a method for collecting a copy of information consisting of (1) sending a copy of the information to a central repository and (2) storing the information in the repository).

alleviates several of the problems with the current PI acquisition models by automatically aggregating PI, not only generic PI as aggregated by portals *but also PI specific to the end user requiring identity verification for access.*" (*Id.*, col. 4:22-26 (emphasis added))  This key concept is addressed in claim 1, where the claim states that the provider data to be retrieved by the method includes "a protocol for instructing the processor how to access the *securely stored personal information* via the network[.]" (*Id.*, col. 16:64-67 (emphasis added))

That key concept, however, really is not captured by Plaid's articulation of the abstract idea.  In other words, the Court cannot conclude that the claim is directed simply to the idea of "retrieving and storing *personal information* from multiple sources"; instead, it is directed to a method of retrieving a particular *type* of personal information:  that which would otherwise be blocked off behind a wall of security, such that verification of one's identity was necessary to access it.  That type of verification process takes time to complete, and finding a way to avoid the need for a user to "individually visit" a number of websites in order to get access to this information was what, in significant part, motivated the patentee to conceive the invention in the first place.  (*Id.*, cols. 2:64-3:2)

Because Plaid's asserted abstract idea does not capture an important aspect of what the claim is directed to, the Court finds that Plaid has not carried its burden at step one.  The Court therefore recommends denial of the Motion as to this claim on this ground alone.  *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

### c.    *Alice*'s step two

Even were the Court wrong in its conclusion at step one, and the claim was found to be directed to Plaid's asserted abstract idea, the Court would still recommend dismissal without

28

prejudice at the step two stage. That is because there are at least issues of fact that must be resolved before one can determine whether the Motion is well taken as to claim 1.

Driving this conclusion is claim 1's requirement that the "processor" called for in element (b) of the claim utilizes a certain "protocol"—a claim element that the parties discussed at length in their briefing. (D.I. 15 at 13-14; D.I. 20 at 7-8) By way of review, the processor involved in performing the method of claim 1 retrieves personal information of an end user. ('783 patent, col. 16:56-57) It does so based in part on the use of certain "information provider data associated with . . . one or more [connected] information providers." (*Id.*, col. 16:59-61) The claim then goes on to explain that: "the provider data includ[es] a protocol for instructing the processor how to access the securely stored personal information [of the end user] via the network[.]" (*Id.*, col. 16:64-67).

What is this "protocol" and what else do we know about the role that it may play in the invention? In an earlier litigation, a federal court had construed the term "provider data" to mean "'[d]ata identifying a specific information provider as well as protocol data defining how to communicate with the provider.'" (*Yodlee, Inc. v. Block Fin. Corp.*, No. 03-0831-CV-W-DW (W.D. Mo. Dec. 2, 2004) (D.I. 16, ex. A at 7) (emphasis omitted)) And after the *Markman* hearing in this case, Chief Judge Stark construed the term "protocol for instructing the processor how to access the securely stored personal information via the network" to mean "'software script for instructing the processor how to access the securely stored personal information via the network[.]'" (D.I. 96 at 22) And so, these constructions suggest at least that the "protocol" has to utilize data that specifically links to a particular information provider and has to (in some way) contain *instructions specific to that information provider* that allow the processor to get access to

29

user data located at the provider.

Now, as Plaid rightly points out, the claim does not (neither on its face, nor via Chief Judge Stark's claim construction) actually say anything specific about "what those instructions *are*" nor claim a "*particular* instruction." (D.I. 20 at 7 (certain emphasis in original, certain emphasis added)) And so, Plaid asserts that claim 1 does not contain an inventive concept, as it merely claims "the *idea of having* a protocol for accessing information." (*Id.* (emphasis in original))

The Court again recognizes that the answer to the step two analysis here is not free from doubt. With regard to the processor's role in claim 1, the claim's description of the "how" does leave a lot to the imagination. Nevertheless, for a few reasons, the Court cannot definitively conclude that claim 1 fails to contain an inventive concept.

For one thing, the Court finds persuasive Yodlee's comparison of claim 1 to other claims that have previously been found to be patent-eligible, despite the fact that these other claims failed to provide the kind of second-level detail that Plaid seems to require. (Tr. at 77-79) In this regard, the Court will focus on one of the cases referenced by Yodlee—*DDR Holdings*—since it plays such a significant role in Federal Circuit Section 101 jurisprudence. In *DDR Holdings*, the Federal Circuit examined three asserted claims for eligibility, *see* 773 F.3d at 1255, including claim 1 of United States Patent No. 7,818,399 (the "'399 patent"), which recites:

> **1.** A method of an outsource provider serving web pages offering commercial opportunities, the method comprising:
>
> (a) automatically at a server of the outsource provider, in response to activation, by a web browser of a computer user, of a link displayed by one of a plurality of first web pages, recognizing as the source page the one of the first web pages on which the link has

been activated;

> (i) wherein each of the first web pages belongs to one of a plurality of web page owners;
>
> (ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and
>
> (iii) wherein the selected merchant, the outsource provider, and the owner of the first web page are each third parties with respect to one another;

(b) automatically retrieving from a storage coupled to the server pre-stored data associated with the source page; and then

(c) automatically with the server computer-generating and transmitting to the web browser a second web page that includes:

> (i) information associated with the commerce object associated with the link that has been activated, and
>
> (ii) a plurality of visually perceptible elements derived from the retrieved pre-stored data and visually corresponding to the source page.

('399 patent, cols. 26:43-27:3) The *DDR Holdings* claim thus recited certain sources of

information that would be utilized in the method used to generate the second web page, and in

this way, "specified how interactions with the Internet are manipulated to yield a desired

result[.]" 773 F.3d at 1258. And so it made it over the bar for Section 101 purposes because it

did not "broadly and generically claim 'use of the Internet' to perform an abstract business

practice (with insignificant added activity)." *Id.* This was so despite the fact that the claim

stopped short of specifying a further set of instructions for *how* the second web page would be

computer-generated or transmitted to the web browser, or being *more specific* about the types of

"information associated with the commerce object" or "visually perceptible elements" that would be used in order to create this second web page.

The instant claim is certainly different in some ways from claim 1 of the '399 patent. But the two claims also share similarities. Like claim 1 in *DDR Holdings*, claim 1 of the '783 patent claims a method that, at least in some sense, "specifie[s] how" the processor at issue is to do its job. That is, it seems to require that the processor utilize both "end user data" and "provider data" to access information from an information provider, *and* that the provider data employs a protocol that must contain instructions specific to that information provider, in order to obtain personal information of the user. *Cf. Helios Software, LLC v. SpectorSoft Corp.*, C.A. No. 12-081-LPS, 2014 WL 4796111, at *8-9, *17 (D. Del. Sept. 18, 2014). It is a close question as to whether these requirements set out a sufficiently "'specific way'" of delivering non-public personal information to an end user, so as to withstand Section 101 scrutiny. *TriPlay, Inc.*, 2015 WL 1927696, at *15 (citing *DDR Holdings*, 773 F.3d at 1258-60)).

The final answer to this close question may turn on the resolution of fact issues. For example, there is some evidence to suggest that the use of the method described in claim 1 would have amounted to more than the use of routine and conventional computer processes in the relevant time period. ('783 patent, col. 2:32-41 & FIG. 4 (describing how, at the time of the patent's issuance, the "current access process" suffered from "several significant deficiencies[,]" in that the end user "must login to each site separately" as each "separate site has its own graphical user interface"); *see also id.* at 4:8-12, 22-26; D.I. 15 at 14 (Yodlee asserting that the claimed solution described by the '783 patent for gathering user-specific information was noteworthy, in that it "does not require the active collaboration of the information provider" and

"is capable of automatically determining the means necessary to gather user-specific personal information from various information provider websites . . ."")); *cf. Intellectual Ventures I, LLC v. Motorola Mobility, LLC*, 81 F. Supp. 3d 356, 369 (D. Del. 2015) ("Even though claim 1 itself does not provide a detailed explanation of how packet headers are used to allocate the bandwidth, the inventive concept lies in the limitation of using packet headers to allocate bandwidth, not in the details of implementation."). A better record, *inter alia*, on this question may make the difference in determining whether the claim is patent eligible.

The Court therefore finds that Plaid has not met its burden to demonstrate that claim 1 fails to contain an inventive concept. This is an alternative basis for denial of the Motion without prejudice as to this claim.

### 3.    '451 Patent

#### a.    The Invention

The '451 patent is entitled "System for Completing a Multi-Component Task Initiated by a Client Involving Web Sites Without Requiring Interaction From the Client." It was issued on January 21, 2003. The patent relates to methods and apparatus, including software, for dividing a "main user task" into multiple sub-tasks to be performed by user-selected web-based services. ('451 patent, col. 1:11-14)

The specification explains that as access to and use of the Internet has increased, so too have web-based services, which perform tasks such as helping to make airline, hotel and car reservations. (*Id.*, col. 1:22-29) Companies offering such services made it progressively easier for subscribers to use their services. (*Id.*, col. 1:30-32) But the number of services hampered the completion of a main task with many sub-tasks, requiring a user to visit multiple services and

33

manually configure the sub-tasks. (*Id.*, col. 1:33-42) This situation necessitated a way for users to complete the main task, including sub-tasks performed by diverse web services, without having to manually visit each web service that is associated with each sub-task. (*Id.*, col. 1:43-48)

The patentee sought to solve this problem through the use of an "Internet portal system . . . comprising an Internet-connected server having access to client-related data; an internet-capable client station usable by a client; and software executing on the server for managing individual component tasks in execution of the multi-component task." (*Id.*, col. 1:52-59) After a client specifies a multi-component task, the software "defines the component tasks, identifies Internet Web sources for completion of the tasks, manages interaction with the identified Web sites gathering results of the interactions, integrates the gathered results, and communicates final results to the client at the client station." (*Id.*, col. 1:59-65) The patent states that due to the invention described therein, for the first time clients of the Internet portal service would be able to initiate these multi-component tasks "at a single entry point" and benefit from systems "manag[ing] completion of the tasks and furnish[ing] results to the client." (*Id.*, col. 3:13-18)

The patent contains two independent claims (claims 1 and 8). Claim 8, on which Plaid focuses, (D.I. 12 at 13), claims:

> **8.** A method for accomplishing, after initiation by a client and completely transparent to a client and without interaction from the client following the initiation, a multi-component task involving interaction with one or more Internet Web sites, comprising steps of:
>
>> (a) defining component tasks based on pre-programmed client-related data by software executing on the Internet-connected subscription server;

34

> (b) identifying third-party Web servers for completion of the component tasks;
>
> (c) managing execution of the component tasks by the software, including interaction with the Web servers identified, and
>
> (d) gathering and integrating results of the component tasks and communicating final results to the client at the client station.

('451 patent, col. 10:26-42)

### b.   *Alice*'s step one

Plaid asserts that claim 8 is "the clearest abstract idea of the bunch[.]"  (Tr. at 32)[16]  In its opening brief, Plaid states the abstract idea as the longstanding business concept of "a service that manages a multi-component task for a customer." (D.I. 12 at 12)  In its reply brief, Plaid described the abstract idea similarly, though in slightly greater detail: "the longstanding business practice of identifying sub-tasks within a larger task, managing completion of those sub-tasks, and communicating the results to the client[.]" (D.I. 20 at 8)  The Court will focus on the latter articulation below, as it more completely fits the structure of claim 8.

From there, the Court agrees (and Yodlee does not dispute) that the idea as articulated is an abstract one.  As Plaid points out, (D.I. 12 at 13), individuals have long identified sub-tasks of a more complex undertaking, managed the completion of such sub-tasks, and conveyed the results to the requesting party.  One example Plaid provides is of a travel agent planning a trip (the complex task) who must identify sub-tasks (booking flights and hotel rooms), identify third-parties that would help with completion of those sub-tasks (an airline and a hotel), complete the

---

[16]      For its part, even Yodlee agrees that this patent (out of the seven patents-in-suit) presents it with the greatest challenge from a Section 101 perspective.  (Tr. at 93)

sub-tasks (make reservations), and convey the results to the requesting party (tell the customer). (*Id.*; *see also* '451 patent, cols. 2:9-12, 5:15-19 (describing how some embodiments of the invention can involve completing such travel-related sub-tasks))  Courts have found similar claims—i.e., those drawn to the generation of or completion of various tasks—as involving abstract ideas.[17]  The abstract idea, as articulated, is surely a "longstanding commercial practice" and "method of organizing human activity[.]" *Alice*, 134 S. Ct. at 2356-57.

The Court also finds that claim 1 is directed to this abstract idea.  There is little question that the patent claim is "directed to" the concept of a (computer-based) method for identifying sub-tasks of a larger task, executing them and communicating the results to a user.  Repeatedly, the specification explains that this is what was "clearly needed" at the time of application, and what the invention would accomplish for "the first time":  to allow a computer using software to perform these services (without need for the individual client to visit each website associated with each sub-task).  ('451 patent, cols. 1:44-49, 3:13-18)

The problem for Yodlee here is that there is really nothing in this claim that suggests that the claim is directed to a *specific* way to make this idea come to life via the use of a computer. Put differently, the claim provides no indication as to why its language amounts to anything more than an instruction to "Apply the abstract idea on a computer (or on a computer running software) . . . somehow . . . ."  At a facial level, this conclusion is indicated by the structure of the

---

[17]     *See Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1338-39, 1344 (Fed. Cir. 2013) (determining that system claims were directed to the abstract idea of "'generating tasks [based on] rules . . . to be completed upon the occurrence of an event[]'"); *Appistry, Inc. v. Amazon.com, Inc.*, No. C15-311 MJP, 2015 WL 4210890, at *2 (W.D. Wash. July 9, 2015) ("The patents describe systems and methods of using a network of multiple actors to . . . complete a task by breaking down the job into small pieces, each handled by a different actor organized within an internal hierarchy.").

claim itself. The claim is made up of four elements, which almost exclusively speak in broad, functional language about what the steps that comprise the method are doing: (1) defining sub-tasks; (2) identifying third-party web servers for completion of the tasks; (3) managing execution of the tasks by the software; and (4) gathering, integrating and communicating the results of the tasks. (*Id.*, col. 10:31-42) Taking all of this together, the Court concludes that the "basic character" of claim 8 is the abstract idea "of identifying sub-tasks within a larger task, managing completion of those sub-tasks, and communicating the results to the client."

Yodlee came forward with arguments to the contrary—as to why there was sufficient specificity or "concrete[ness]" in the claim such that the claim could not be said to be directed to the abstract idea at issue. (*See, e.g.*, D.I. 15 at 17) *Enfish* suggests that whether the claims are directed to a "specific" asserted "improvement" in computer-related technology is something that can (and often should) be assessed at *Alice*'s step one, and so the Court will examine Yodlee's arguments here. 2016 WL 2756255, at *5. It does so noting that this analysis will be largely (if not completely) similar to the analysis it would perform at step two (as to whether the claimed method recites anything other than components that involve performing "well-understood, routine, and conventional activities commonly used in the industry"). *Compare In re TLI Commc'ns LLC Patent Litig.*, — F.3d —, 2016 WL 2865693, at *3-4 (Fed. Cir. May 17, 2016) (concluding at step one, that a "telephone unit" and "server" called out in the claims were described in functional terms or in terms of performing generic computer functions, such that the claims were not directed to a specific solution to a technological problem, but instead to the abstract idea of "classifying and storing digital images in an organized manner"), *with id.* at *5-6 (assessing the "telephone unit" and "server" again at step two, noting again that they are

37

described in the patent as performing only "basic computer functions" or "functions 'known' in the art[,]" and thus concluding that these elements could not add an inventive concept to the abstract idea at issue).[18]

In its briefing, Yodlee's first argument as to why the claims of the '451 patent (including claim 8) are patent-eligible was focused on certain "material elements" found in the claims. (D.I. 15 at 17) Yodlee here cited to claim 1's inclusion of an "Internet-connected server having access to client-related data" that utilizes software, and an "internet-capable client station usable by a client"; as to claim 8, it noted that the claim similarly invokes the use of such a server and client station. (*Id.*; *see also* '451 patent, cols. 9:53-55, 10:31-42) Yodlee's argument was that, *inter alia*, the server found in claim 8 is required to "identif[y] third-part[y] Web sources" to complete the component tasks—and that the claim cannot amount to an abstract idea because the server is an "integral, concrete object[] performing specific functions[.]" (D.I. 15 at 17)

If the argument here is that claim 8 is not directed to an abstract idea because it contains reference to a "concrete" thing, such as an Internet-connected server (or a client station), that argument is not a winning one. "[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention[,]" and so the "fact that a computer 'necessarily exist[s] in the physical, rather than purely conceptual, realm' . . . is beside the point." *Alice*, 134 S. Ct. at 2358 (citation omitted).   Indeed, more broadly, the patent's specification provides no indication that *any* particular, non-ubiquitous hardware is required to carry out the

---

[18]     Indeed, the Court is not certain how often an analysis at step one as to whether claims are directed to *specific improvements* in computer capabilities will differ significantly from an analysis at step two as to whether certain claim elements do more than perform *basic, conventional* computer functions.

claimed process:

> In a preferred embodiment of the present invention an Internet portal system . . . is provided, comprising an Internet-connected server having access to client-related data; an internet-capable client station usable by a client; and software executing on the server for managing individual component tasks in execution of the multi-component task.

('451 patent, col. 1:52-59; *see also id.*, col. 4:47-52 (noting, as to a preferred embodiment, that "Internet-capable devices other than [a] PC [] may be used to practice the present invention such as a notebook computer, a WEB TV, hand-held devices, and any other known device having a display means and suitable memory")) To the extent Yodlee asserts that these "concrete" (as opposed to "abstract") components imbue claim 8 with patent-eligible subject matter, the Court disagrees.

Yodlee's next makes a related argument—that the invention is sufficiently "concrete" because it "necessarily involves a server *running software*" to perform the claimed steps. (D.I. 15 at 17-18 (emphasis added); *see also* '451 patent, cols. 1:59-65) But that argument is similarly unavailing. It is true, of course, that claim 8 does explicitly require the use of "software" to perform at least two of the steps recited therein (step (a)'s "defining component tasks based on pre-programmed client-related data" and step (c)'s "managing execution of the component tasks"). ('451 patent, col. 10:31-33, 36-38) Further, Chief Judge Stark construed a portion of step (a) as "using software executing on the Internet-connected subscription server to define component tasks based on client-related data provided to the software prior to the sign-in component task[.]" (D.I. 96 at 29) But this construction did not attribute any specificity to what was required of the "software" at issue, beyond requiring the "software" to define sub-tasks

39

based on "client-related data."[19] And Yodlee did not otherwise explain, either in its briefing or at

oral argument, why the invocation of "software" serves as a meaningful limitation, nor did it seek

a construction of the term "software" that would provide any such specificity. The caselaw is

clear that simply requiring the use of a software "brain" to effectuate an abstract idea is not

enough to supply the requisite inventive concept.[20] *Intellectual Ventures I LLC v. Capital One*

*Bank (USA)*, 792 F.3d 1363, 1371 (Fed. Cir. 2015) ("Requiring the use of a 'software' 'brain'

'tasked with tailoring information and providing it to the user' provides no additional limitation

beyond applying an abstract idea, restricted to the Internet, on a generic computer."); *Accenture*

*Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013)

(concluding, despite "very detailed software implementation guidelines[]" in the specification,

that the "system claims themselves only contain generalized software components arranged to

implement an abstract concept on a computer"); *cf. Card Verification Sols., LLC v. Citigroup*

---

[19]     Under Chief Judge Stark's construction, in the context of claim 8's step (a), the "software" "must define component tasks based on client-related data provided to the software" and the "client-provided data must influence the tasks that the software defines[.]" (D.I. 96 at 29-30) Although this language requires the use (and influence) of "client-provided data" in the software's definition of sub-tasks, it is clear that the use of such data cannot serve as a meaningful limitation. Indeed, the specification indicates that "client-provided data" is an extremely broad term, covering just about any kind of "data" relating to a user. (*See, e.g.*, '451 patent, col. 4:28-33 ("In addition to specific user data such as identification, account information, and *the like*, additional profiling data consisting of *any* data associated with a user profile regarding WEB services that a user may subscribe to may be stored . . . .") (emphasis added))

[20]     In its briefing, Yodlee additionally cites to the specification for the idea that the "'451 patent utilizes an 'application layer multicast architecture,' which allows the claimed systems and methods to multicast various types of messaging to a plurality of WEB servers and to have responses routed back to the user's single point interface." (D.I. 15 at 18 (citing '451 patent, col. 5:1-4)) But the Court is unable to find similar language in the asserted representative claim 8. Nor did Yodlee—either in its briefing or at oral argument—articulate how this "multicasting" limitation was required by the wording of claim 8. (D.I. 20 at 8 n.5) For these reasons, the Court does not find that this argument is helpful to Yodlee.

*Inc.*, 13 C 6339, 2014 WL 4922524, at *4 (N.D. Ill. Sept. 29, 2014) ("Although simply

implementing an abstract idea on a computer is not a patentable application of the idea, . . . a

plausibly narrowing limitation is that of required pseudorandom tag generating software.").[21]

     An additional line of argument that Yodlee barely alluded to in its briefing, (D.I. 15 at

17), but that was discussed by its counsel a bit more fully at oral argument, (Tr. at 84-88), relates

to the concept of "transparency." Yodlee here points to the fact that the preamble of claim 8

states that the method is accomplished "completely transparent to a client and without interaction

from the client following the initiation[.]" ('451 patent, col. 10:27-28)[22] Yodlee argues that this

limitation requires that the method uses software that recognizes that a task has been identified,

"decompose[s that task] automatically [into certain sub-tasks, and] perform[s those sub-tasks]

automatically[, such that] the communication [is] totally managed automatically." (Tr. at 88)[23]

---

[21]     It is also of no moment that, as Yodlee notes, (D.I. 15 at 17-18), the method at issue involves the use of software executing *on the Internet* or interaction with *Internet-connected* websites. That is because "limiting the use of an abstract idea to a particular technological environment" is also not enough to confer patent eligibility. *Alice*, 134 S. Ct. at 2358 (internal quotation marks and citation omitted).

[22]     Whether a preamble limits the claim is an issue of claim construction, *see Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-09 (Fed. Cir. 2002) (discussing considerations for determining whether a preamble is limiting), but one that was not taken up at the prior *Markman* hearing in this case. The Court will presume, for purposes of review of this Motion, that the preamble here is limiting. *See Content Extraction*, 776 F.3d at 1349.

[23]     At another point, Yodlee's counsel elaborated that to understand "what does it mean to [perform the method "transparently" one must understand that] the specification says that if I make a meeting in my calendar to meet John Smith in Madison, Wisconsin on Thursday, the system will decompose that into subtasks that say, Hey, I need an airline reservation. I need a hotel. I need a rental car. And it will go out and do those things. And then it will come back to me with the integrated result that says, Here's all your travel information. . . . And so those are examples about what this transparently to a client means in the '451 claims." (Tr. at 83-84)

The difficulty for Yodlee is that it is well-established that "[m]erely using a computer to perform more efficiently [or quickly] what could otherwise be accomplished manually does not confer patent-eligibility." *buySAFE, Inc. v. Google Inc.*, 964 F. Supp. 2d 331, 336 (D. Del. 2013) (citing *Bancorp. Servs., L.L.C.*, 687 F.3d at 1279), *aff'd*, 765 F.3d 1350 (Fed. Cir. 2014); *see also Tenon & Groove, LLC v. Plusgrade S.E.C.*, C.A. No. 12-1118-GMS-SRF, 2015 WL 82531, at *5 (D. Del. Jan. 6, 2015) (same).  Here, the claim (including the above-referenced wording in its preamble) does not "provide any detail as to how the computer is involved in the claimed process, or describe the significance of the computer to that process . . . [such that] the only difference [between performance of the method by a human and by a computer is] that the computer performs the process significantly faster than a human." *buySAFE, Inc.*, 964 F. Supp. 2d at 336.

Lastly, at oral argument, Yodlee eventually raised yet another argument for patent eligibility—that claim 8's reference to the software's "*gathering* and integrating results" actually amounts to an invocation of the "software gathering agent" referenced in the '077 patent (and to the gathering agent's requisite functionality, as set out in Section III.B.1).  (*See* Tr. at 89-91; '451 patent, col. 10:40; '077 patent, col. 18:38)  Whatever the merit of this argument,[24] the Court will not consider it here.  That is because the Court has reviewed the arguments regarding the '451

---

[24]     The Court notes that while the term "software gathering agent" was found in claim 7 of the '077 patent, only the terms "gathering . . . results" or "gathered results" are found in claims 1 and 8 of the '451 patent.  ('077 patent, col. 18:38; '451 patent, col. 10:1-2, 40)  Additionally, the language in the '077 patent's specification, which Chief Judge Stark cited in his *Markman* order as giving rise to the key features of the "software gathering agent," (D.I. 96 at 15 (citing '077 patent, cols. 9:54-64, 11:35-55)), is not found in the '451 patent's specification.

patent in Yodlee's answering brief, and cannot find this argument fairly made anywhere therein.[25]

(D.I. 15 at 16-19)  Proceeding otherwise would unfairly prejudice Plaid.  *See Tomasko v. Ira H.*

*Weinstock, P.C.*, 357 F. App'x 472, 479 (3d Cir. 2009); *Watkins v. Int'l Union, Secur., Police &*

*Fire Prof'ls. Of Am.*, C.A. No. 15-444-LPS, 2016 WL 1166323, at *4 n.4 (D. Del. Mar. 23,

2016) (citing cases).

    For all of the above reasons, the Court finds that claim 8 is directed to an abstract idea.

       **c.**    *Alice***'s step two**

    For many of the same reasons set out above as to why claim 8 is not directed to a specific

improvement in computer technology, the Court finds that the claim does not require anything

other than the use of "conventional" software-based technology, such that it does not invoke the

requisite inventive concept.  *Cf. In re TLI Commc'ns LLC Patent Litig.*, 2016 WL 2865693, at

*5-6.  Claim 8 uses largely functional language, thereby appearing to "contain[] no restriction on

how" the result brought forth from its steps are to be accomplished; it simply appears to

"describe[] the [sought-after] effect or result" itself.  *Internet Patents*, 790 F.3d at 1348.  The

Court therefore concludes that claim 8 lacks the requisite element or combination of elements

that would be sufficient to ensure that the claim amounts to something more than the idea of

"identifying sub-tasks within a larger task, managing completion of those sub-tasks, and

communicating the results to the client."[26]  It thus recommends that Plaid's Motion be granted as

---

[25]    Indeed, at oral argument, Yodlee's counsel did not even emphasize this argument in his initial presentation, making it only after the Court asked certain specific questions as to where in the claim language were meaningful limitations on the asserted abstract idea to be found.  (Tr. at 89-90)

[26]    Yodlee argued that the '451 patent does not preempt substantially all applications of an abstract idea, including Plaid's asserted abstract idea.  (D.I. 15 at 18-19)  Specifically,

to this claim.

### 4.   The '548 and '520 Patents

#### a.   The Invention

The '548 and '520 patents are both entitled "Method and Apparatus for Restructuring of Personalized Data from Transmission from a Data Network to Connected and Portable Network Appliances[.]"[27]   The former was issued on August 28, 2007, and the latter on September 9, 2008.  The claimed invention is in the field of "network information services including data gathering and transmission over wired and wireless network connections[.]"  ('548 patent, col. 1:19-21)

The specifications explain that, with the help of an Internet-capable appliance and an Internet connection, a person can obtain virtually any type of information stored on network-connected servers.  (*Id.*, col. 1:32-36)  Appliances that could access the network and navigate the Internet had grown from personal computers to electronic communication devices, including laptops and personal digital assistants.  (*Id.*, col. 1:37-44)  Some of these new devices accessed the Internet through wireless connections, while others received data transmitted through a gateway to a network generic to the device.  (*Id.*, col. 1:44-47)

The ability of the network appliances to connect to the Internet is subject to the

---

Yodlee argued that the patent "disclaim[s] systems which utilize client interaction or which lack server access to client data[,]" and thus, "the claims of the '451 patent cannot preempt the field[.]"  (*Id.* at 19)  As the Court has already found that claim 8 discloses only patent-ineligible subject matter, Yodlee's preemption arguments are considered to be fully addressed and made moot.  *Gammino v. Am. Tel. & Tel. Co.*, 127 F. Supp. 3d 264, 274 (D. Del. 2015) (citing *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015)).

[27]   The specifications for each patent are nearly identical.  (D.I. 15 at 19 n.8)  The Court will thus cite only to the '548 patent, unless otherwise noted.

availability of bandwidth resources, which in turn depends on "network traffic, reliability and capability of lines, power of appliance processor, nature of intermediary network, and a host of other variables." (*Id.*, col. 1:50-57)  In light of these variables, a network appliance cannot always maintain an Internet connection for a reliable length of time, sometimes experiencing only intermittent connections or no access at all. (*Id.*, col. 1:57-63)  Administrators of network equipment and connection architecture and companies hosting web-based services sought to improve network communication by upgrading equipment, developing better data compression and bandwidth reservation techniques, and lobbying for more bandwidth for wireless intermediary networks. (*Id.*, col. 2:7-14)

One area that could improve network communications went overlooked—the format and structures of data being transmitted. (*Id.*, col. 2:14-16)  For example, certain forms of content were unsuitable for transmission under low bandwidth conditions to devices having lower memory, thereby limiting such devices to certain types of data (i.e., e-mail or voice mail). (*Id.*, col. 2:16-21)  Even if the content was in a suitable format, it could overload the device's memory if additional data restructuring and synchronization steps were not taken. (*Id.*, col. 2:54-57)  A growing number of portable devices with Internet-access capabilities were unable to receive or send certain types of data under normal circumstances; these devices had features that precluded them from broad Internet navigation capabilities and limited their download capabilities in terms of time and types of data content that could be received. (*Id.*, col. 2:58-67)  These conditions necessitated a method and apparatus "for intelligent restructuring of personalized data and, in some cases, generalized data from the Internet into model/device-specific data formats such that [the data] may be easily made available for transmission to and presentation by a variety of

45

known communication devices[.]" (*Id.*, col. 3:1-7) This would result in broadening the scope of

Internet-sourced data that a communication device could independently access and receive,

without requiring hardware or software modifications to the device. (*Id.*, col. 3:7-11)

The patents each contain two independent claims—claims 1 and 20 in the '548 patent and

claims 1 and 21 in the '520 patent. Plaid focused on claims 20 and 21, respectively. (D.I. 12 at

14-15) Claim 20 of the '548 patent recites:

> **20.** A method for providing information from an Internet source for a client device, comprising:
>
> (a) maintaining client profiles for subscribers, the client profiles including data relative to information destinations on the Internet for a specific client, data records to be retrieved from the destinations, and data forms for transformation of specific records;
>
> (b) accessing information from the Internet destinations in a first format;
>
> (c) translating the information into a format compatible with an application, other than an Internet browser application, executable on the client device; and
>
> (d) transmitting the information for the client device for presentation in the format compatible with the other than a format for an Internet browser application according to the client profiles.

('548 patent, col. 16:18-33) Claim 21 of the '520 patent recites:

> **21.** A method for retrieving and disseminating information records on behalf of a specific client from Internet sources, comprising steps of:
>
> (a) collecting a record associated uniquely with the client in a first data form from an Internet source by a server connected to the Internet;
>
> (b) transforming the record into a second data form specific to an application other than an Internet browser application, the

application executable by a digital appliance operated by the client connectable to the server; and

(c) transmitting the transformed record to the digital appliance for display.

('520 patent, col. 16:9-20)

### b.   *Alice*'s step one

Plaid argues that the claims of the '548 and '520 patents are directed to the abstract idea of "transforming data from one form to another." (D.I. 12 at 14; *see also* Tr. at 37)  The Court agrees (and again Yodlee does not dispute) that this is an abstract idea.  In two recent cases, for example, our Court found that claimed methods for transforming data from one form to another were directed to abstract ideas.  In *Messaging Gateway Sols., LLC v. Amdocs, Inc.*, Civil Action No. 14–732–RGA, 2015 WL 1744343, at *4 (D. Del. Apr. 15, 2015), a claim reciting the steps of "a computer system receiv[ing] an SMS text message, convert[ing] it to an Internet Protocol message, and deliver[ing] the converted message[]" was directed to the "abstract idea of translation."  In *Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*, Civil Action No. 14-612-RGA, 2015 WL 5156526, at *2-3 (D. Del. Sept. 2, 2015), this Court similarly concluded that a claim requiring "a computer system that receives a payload in one media form, translates it into a different media form, and delivers the translated payload[,]" was directed to the abstract idea of "'translation.'"  Although Plaid's articulation of the idea at issue in this case is a bit different than in these prior two cases, the result of the legal analysis is similar—Plaid has identified an abstract idea.

Are the claims directed to the abstract idea of "transforming data from one form to another"?  On that score, the Court notes that after reviewing the patent specifications, it is at

least clear how the patentee described the asserted improvement to computer technology that was promoted by the patents. The specifications, in fact, come right out and state what is the "further innovation" necessary to "accomplish the goal of the present invention": "the intelligent restructuring of data coming into and leaving from the service of the present invention." ('548 patent, col. 7:67-8:4; *see also id.*, col. 3:1-7 (the specifications noting that what is "clearly needed" at the time of patenting was "a method and apparatus for intelligent restructuring of personalized data [and] generalized data from the Internet into model/device-specific data formats"); *id.*, col. 8:35-42) These "intelligent restructuring" methods and apparatus would then better allow data to be made available for transmission to and presentation by a variety of known communication devices. (*Id.*, col. 3:4-7)

But even if developing this "intelligent restructuring"-type improvement to computer technology was the goal of the patentee, in order to pass step one, the language of claims 20 and 21 need to convey at least some amount of specificity as to how that "restructuring" is to be accomplished. Put differently, if the claim language simply amounts to an instruction to "transform data" (without any meaningful nod as to how to do so), the claims would be directed to nothing more than an abstract idea. And explaining why the claims do not fail step one was a challenge for Yodlee. Indeed, at oral argument, in describing what these patents were "about[,]" Yodlee's counsel stated that they were about "transforming data[,]"[28] (Tr. at 93), or the "idea of [] translating from two things that aren't supposed to work together[,]" (*id.* at 98; *see also id.* at 100 (Yodlee's counsel explaining that the key concept in the patents is that "it's this translation

---

[28]     Yodlee's counsel did, however, continue by stating that such transformation does not occur "in a generic sense." (Tr. at 93)

from what you get off the web page to an application other than a web browser that is essentially the heart of the claim[]")).  What more, though, than the idea of "transforming" or "translating" data (in any way one could imagine) is there here?

Again, as it did with the '451 patent, the Court will address this "specificity" question at step one.  In doing so, it will focus on Yodlee's arguments as to why the patents "claim a *particular* system and method for 'restructuring of personal data . . . for the purpose of enabling receipt of such data by a variety of connected and portable network appliances without requiring added hardware or software.'"  (D.I. 15 at 22 (emphasis added) (citing '548 patent, col. 1:22-25); Tr. at 94-102)

Yodlee argued that the patents "describe a specific solution . . . by disclosing software that understands the data gathered from the Internet and 'the parameters encompassing the formats and data presentation schemes of various software routines used in various Internet-capable appliances.'"  (D.I. 15 at 20)  Yet Yodlee has failed to articulate where *in the claims* the components of this "specific solution" are found.  *See Clear with Computs., LLC v. Altec Indus., Inc.*, Case Nos. 6:14-CV-79, 6:14-CV-89, 2015 WL 993392, at *5 (E.D. Tex. Mar. 3, 2015) (rejecting the patentee's argument that many of the challenged limitations required specialized computer programming where "the claims as a whole broadly recite a simple process which . . . does not require the type of complex programming that confers patent eligibility").

For example, Yodlee mentioned that in a certain embodiment described in the specification, the patent refers to software using certain "input and output templates" when restructuring data.  (D.I. 15 at 20 (citing '548 patent, cols. 9:33-10:3))  But claims 20 and 21 do not recite the utilization of these templates.  In its briefing and at oral argument, Yodlee did not

point to any claim term in claims 20 and 21 whose construction would require utilization of such templates. At the *Markman* stage, Yodlee did not propose that such a limitation was to be found in the construction of any terms located in these claims. (D.I. 96 at 31-35)  And to the contrary, in its briefing, Yodlee noted that these input and output templates are particularly called out in dependent claims of the two patents, further indicating that they are not required by claims 20 or 21. (D.I. 15 at 21-22; *see also* '548 patent, cols. 15:27-33, 16:56-62; '520 patent, cols. 15:21-27, 16:48-54); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed. Cir. 2005) ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Additionally, Yodlee pointed to another asserted aspect of the claimed solution—"the maintenance of client profiles[.]" (D.I. 15 at 20)  The claims do reference "client profiles" (or, in the case of claim 21, a "record associated uniquely with the client").[29]  Claim 20's reference to "client profiles" notes that they include "data relative to information destinations on the Internet for a specific client, data records to be retrieved from the destinations, and data forms for transformation of specific records[.]" ('548 patent, col. 16:21-24)[30]  Yodlee then appears to assert that what is relevant here to the specificity inquiry is that the patents go on to "further describe a

---

[29]     The Court does not believe it likely that claim 21's reference to a "record" is the same thing as a reference to a "client profile." (*See* '520 patent, col. 16:42 (claim 28 of the '520 patent, which is dependent from claim 21, specifically calling out the use of "client profiles"); *id.*, col. 3:46-51 ("Also in *some embodiments* the intermediary server system is a subscription system, and maintains *client profiles* for subscribers to the system . . . .") (emphasis added))  In resolving this Rule 12(b)(6) motion, the Court will nevertheless assume (without deciding), that this "record" is a reference to "client profile."

[30]     In his *Markman* opinion, Chief Judge Stark found simply that "client profiles" should be afforded its plain and ordinary meaning because claim 20 states what a client profile "'include[s].'" (D.I. 96 at 31)

method of synchronization for keeping [data on] a client device up-to-date[;]" in doing so,

Yodlee focuses on a portion of the specifications that describes this synchronization process.

(D.I. 15 at 20-21(citing '548 patent, col. 4:19-34); *id.* at 22; *see also* '520 patent, col. 4:20-34)

However, as with the input and output templates, neither claim 20 or 21 specifically references

the concept of synchronization.  Moreover, Yodlee has not suggested a construction of the

"maintaining" term in claim 20 or the "collecting" term in claim 21 that would require such a

limitation.  Indeed, to the contrary, Yodlee has acknowledged that a "synchronization service"

appears only in certain dependent claims of the patents.  (*See* '548 patent, cols. 16:1-4, 18:4-7;

'520 patent, cols. 15:59-62, 18:1-4; Tr. at 101)  Again, this all helps confirm for the Court that

independent claims 20 and 21 do not require synchronization. *See Phillips*, 415 F.3d at 1314-

15.[31]

      The claims here use broad, functional language.  They are, according to the patent,

focused on the idea of translating data into a new form, but they say almost nothing about *how*

*that translation must occur*.  The Court thus concludes that the claims are directed to the abstract

idea of "transforming data from one form to another."

### c.   *Alice*'s step two

      Yodlee put forward another line of argument as to why the claims should survive a

Section 101 analysis:  the claims at issue are similar to those found patent-eligible by this Court

---

      [31]     During oral argument, Yodlee's counsel made brief reference to the fact that the
'548 patent includes reference to "data forms" that are included in the "client profiles" referenced
in, *inter alia*, claim 20.  (Tr. at 95)  To the extent that Yodlee seeks to make a separate argument
as to claim 20's eligibility that relies on the inclusion of this term, the Court will not consider it,
as it is an argument not made with any specificity in Yodlee's briefing.  (D.I. 15 at 19-23); *see*
*also supra* Section III.B.3.b.

in *Messaging Gateway Solutions*. (Tr. at 97-100)  Since the ruling in that case turned on whether

the claim at issue involved an "inventive concept," the Court will assess this argument at the step

two stage.

The *Messaging Gateway Solutions* Court was considering challenges to the validity of a

claimed method for facilitating two-way communication between a mobile device and an Internet

server.  2015 WL 1744343, at *3-4.  The claim at issue there recited:

> A method of using a computer system to facilitate two-way
> communication between a mobile device and an Internet server,
> comprising:
>
>> the computer system receiving a text message via a first
>> communication path;
>>
>> the computer system inserting at least a message body of
>> the text message into an Internet Protocol (IP) message; and
>>
>> the computer system transmitting the IP message to the
>> Internet server, via a second communication path,
>>
>> wherein the text message originates from the mobile device
>> as a short message service (SMS) text message, and
>> wherein the SMS text message contains a multidigit
>> address that is fewer than seven digits and that is associated
>> with a URL of the internet server.

*Id.* at *2-3.  The *Messaging Gateway Solutions* Court determined that, although the claim was

directed to the abstract idea of "translation[,]" it contained an inventive concept.  *Id.* at *4-5.  In

concluding that the claim was analogous to those at issue in *DDR Holdings*, this Court found that

the claim "*specifies how* an interaction between a mobile phone and a computer is manipulated in

order to achieve a desired result which overrides conventional practice[.]"  *Id.* at *5 (emphasis

added).  That was so because "[c]onventionally, phones could not send SMS text messages to

computers[,]" but the "claimed method manipulate[d] that interaction by translating the message in a way [i.e., by inserting the message body of the SMS text message into an IP message] that allow[ed] the computer to receive and understand the message." *Id.* The claim also had "meaningful limitations that prevent[ed] it from preempting the abstract idea of receiving, translating, and delivering a message[,]" in that it was "limited to SMS text messages between a mobile device and the Internet." *Id.*

Yodlee asserts that the '548 and '520 patents encompass the same idea of "translating from two things that aren't supposed to work together." (Tr. at 98) And like the *Messaging Gateway Solutions* claim, Yodlee contends that the patent claims at issue here address a similar technical bar: "getting information pulled off the web" and putting it onto an electronic appliance. (*Id.* at 99-100)

The Court does not find the comparison apt. Although claims 20 and 21 may seek to address a technological *problem* similar to the one in *Messaging Gateway Solutions*, the claim at issue in *Messaging Gateway Solutions* provided specificity as to the *claimed solution* to that problem—sufficient to show how the claim amounted to a patent-eligible application of the abstract idea at issue. That is, the claim in *Messaging Gateway Solutions* described not only the type of message that was to be converted (an SMS text message), but also described how it was that the invention was to go about doing the converting (by inserting the body of that SMS message into an Internet Protocol message). The Court is unable to find anything approaching that level of detail in claims 20 and 21. Admittedly, the claims do require that the ultimate format of the translated information be "compatible with" "an application, other than an Internet browser application," ('548 patent, col. 16:27-29; *see also* '520 patent, col. 16:15-17 (reciting a

53

similar limitation)), but they say nothing about *how* that translation is to be accomplished. Nor, for example, does claim 20 contain any restriction on what *type* of application the new format need be compatible with, other than that it be a "'format compatible with at least one application that is not an Internet browser application[.]'" (D.I. 96 at 33-34)[32] For these reasons, the Court finds Yodlee's comparison unpersuasive.

The Court thus concludes that claim 20 of the '548 patent and claim 21 of the '520 patent do not contain an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible invention. Therefore, the Court recommends that Plaid's Motion be granted as to these two claims.[33]

### 5.    '535 and '515 Patents

#### a.    The Invention

The '535 and '515 patents are entitled "Categorization of Summarized Information." The former was issued on July 6, 2010 and the latter on September 11, 2012. Both patents are related to the '077 patent,[34] and the '515 patent is a continuation of the '535 patent. ('515 patent, col. 1:7-9) The patents' invention involves gathering summary information from users or websites and presenting that information to the user through push or pull technology. ('535 patent, col. 1:18-

---

[32]    Claim 21 of the '520 patent similarly requires only that the "form specific to an application" be "designed for an application that is not an Internet browser application." (D.I. 96 at 33-34)

[33]    In light of this conclusion, Yodlee's preemption arguments, (D.I. 15 at 23), are considered to be fully addressed and made moot, *see Gammino*, 127 F. Supp. 3d at 274.

[34]    Yodlee asserts that the '535 and '515 patents "build upon the pioneering scraping technology of the '077 patent." (D.I. 15 at 23)

22)[35]

The patents' specifications provide much of the same background to the claimed invention as does the '077 patent, in that they describe the availability of subscription services accessible through the Internet. (*Id.*, col. 1:35-36) And as did the '077 patent, these patents explain how users with multiple subscriptions faced the problem of having to use too many different passwords and login codes to get access to information, or of having to complete many other complicated steps to do so. (*Id.*, cols. 1:44-2:2) These hurdles necessitated a method and apparatus capable of navigating to user-supplied or known URL's independently, logging in with the appropriate password information at each URL (if required), and returning a summary of the user-requested information in a human and machine-readable document. (*Id.*, col. 2:41-46) The patents also note that this system would have increased value if it could categorize collected information in a variety of ways for the user. (*Id.*, col. 2:49-51)

The specifications summarize the invention as a system comprised of a "collection function" that gathers transactional information for individuals or enterprises, and a "processing function" that categorizes the individual transactions according to at least part of the transaction description. (*Id.*, col. 2:55-61) The categorization of collected and summarized information builds upon the gathering and summarization technology described in the '077 patent.[36] (*Id.*, col. 17:60-66) Once the information has been collected, summarized, and presented, the patent notes that a user may further wish to track specific information over a particular time period. (*Id.*, col.

---

[35]     Like the previous pair of patents, the specifications of the '535 and '515 patents are nearly identical. The Court will cite only to the '535 patent unless otherwise noted.

[36]     The specifications' descriptions of the preferred embodiments are identical up to the discussion of the categorization technology.

17:66-18:7)

One example provided in the specifications includes a client (or subscriber) who wishes to track expenditures at a specific store on a weekly basis to aid in budgeting. (*Id.*, col. 18:51-56) Based on the client's profile and instructions, the system would "scrape" information from the client's accounts that relates to the specified store, summarize that information, and present it to the client. (*Id.*, cols. 18:59-19:3) Another example includes the category of transactions for "travel-related" expenditures, for which the system would develop a set of identifiers—such as "'gas', 'Chevron', 'station', 'oil', [and] 'lube service'"—indicative of expenditures related to the client's travel. (*Id.*, col. 19:17-33) The identifiers may come from client-provided information, which the system may use to categorize transactions of other clients. (*Id.*, col. 19:34-42)

The specifications identify a "key ingredient" of the claimed system as its "ability to grow and improve the network categorization system." (*Id.*, col. 19:43-44) One possible way that the system could grow and improve is where one client enters a descriptor as a particular category of transaction, and then the system is adapted to treat all such descriptors as being in that category (until any errors occurring in that process are later found that might cause reconsideration and amendment of how that descriptor is used). (*Id.*, col. 19:44-49) Other ways in which the system could improve its categorization efforts include using identifiers based on "a majority use among clients" or based on whether the identifiers meet a probability threshold. (*Id.*, col. 19:49-55) Further embodiments could incorporate predictive and budgeting functionality. (*Id.*, col. 19:56-66)

Plaid focuses its briefing on claim 6 of the '535 patent and claim 7 of the '515 patent. Claim 6 recites:

**6.** In a computer system, a method for sorting and reporting transaction information using proprietary software tangibly embodied on a computer-readable medium, comprising:

(a) automatically navigating to and retrieving transaction information associated with a specific person or enterprise from third-party Internet-connected web sites and gathering information concerning transactions by a collection function of the proprietary software said information including at least date, description, and amount of the transactions;

(b) requesting a summary of transactions by a client via an input function of the proprietary software over a specific range of dates, according to a definition of purpose of transactions including at least expenditure types;

(c) categorizing individual ones of the collected transactions according to at least part of the transaction description for determining the purpose, via a processing function of the proprietary software using pre-stored description characteristics associated with the purpose;

(d) summarizing, by a compilation function of the proprietary software, the transactions that meet the purpose and fall into the specific range of dates;

(e) reporting the summary of transactions to the particular person or enterprise by a reporting function;

(f) storing past transaction history associated with the particular person or enterprise,
wherein the past transaction history is used to predict future transaction statistical information, and
wherein a probability algorithm is used in developing the description characteristics, and wherein the description characteristics are periodically amended according to further information that is collected and processed.

(*Id.*, cols. 21:1-22:10)  Claim 7 of the '515 patent similarly recites:

**7.** A method for sorting and reporting financial transaction information, comprising:

(a) navigating to one or more network information sites by a collector software function executing from memory of an Internet-connected server and retrieving therefrom financial transaction information regarding expenditures associated with a specific person or enterprise, the transaction information including at least date, description and amount of the transactions:

(b) providing by a user to the system through an input function of the software a request for a summary of transactions over a specific range of dates, according to types and category of expenditures;

(c) parsing the collected transaction descriptions by a processing function, determining an purpose expenditure category from a plurality of possible expenditures for each expenditure, using pre-stored description characteristics associated with each category, and summarizing those transactions that meet the purpose and fall into the date range; and

(d) reporting the summarized transactions by a reporting function of the software,
wherein expenditure categories are developed from information taken from communication between users and the system,
wherein a probability algorithm is used in developing the expenditure categories, and
wherein the expenditure categories are periodically amended according to further information that is collected and processed.

('515 patent, cols. 21:3-22:8)

### b.    *Alice*'s step one

Plaid asserts, pursuant to step one of the *Alice* framework, that claim 6 of the '535 and claim 7 of the '515 patent are directed to the abstract idea of "creating a summary of 'past transaction history' to 'predict future transaction statistical information[,]'" or more generally, "summarizing purchase data for a business purpose[.]" (D.I. 12 at 17; *see also* D.I. 20 at 11 (in its reply brief, Plaid describing the abstract idea as "summarizing past transaction data to predict future purchases[.]")) Categorizing information, Plaid asserts, is "what people have been doing

for many, many years." (Tr. at 45)[37]

The Court agrees with Plaid (and it is not really disputed here) that businesses have used

past transaction information to predict future transactions or for business purposes long before

the '535 and '515 patents existed. Those ideas, or close variations of them, have been found to

amount to abstract ideas. *Cf. OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-63

(Fed. Cir. 2015) (concluding that the concept of offer-based price optimization was a

fundamental economic concept); *Tuxis Techs., LLC v. Amazon.com, Inc.*, Civil Action No. 13-

1771-RGA, 2014 WL 4382446, at *3 (D. Del. Sept. 3, 2014) (finding abstract the idea of

"offering something to a customer based on his or her interest in something else[]") (internal

quotation marks and citation omitted).

The key question as to step one, however, is whether Plaid's asserted abstract idea

encompasses the "basic character" of the claimed inventions. The Court concludes that it does

not.

The patents' specifications aid the Court in coming to this conclusion. They make clear

that the claimed inventions are meant to build upon the summarization technology described in

the '077 patent. ('535 patent, col. 1:7-12 (describing the patent's relationship to the '077 patent);

*id*, col. 2:41-49 (describing the system disclosed in the '077 patent); D.I. 15 at 23 ("The '535 and

---

[37]     At oral argument, Plaid provided yet another different articulation of the asserted
abstract idea: "[s]ummarizing transactions based on characteristics showing their purpose." (Tr.
at 47) A movant's inability to clearly and uniformly articulate the asserted abstract idea in
question can make the *Alice* analysis difficult for the Court, and there are times when it can
suggest weakness in the movant's overall position. *Cf. DDR Holdings*, 773 F.3d at 1257. This
appears to be one such instance. Here, the Court will apply the articulations of the abstract idea
that were referenced in Plaid's briefing, set out in the text above. The Court notes that its
conclusions would remain unchanged regardless of which formulation of the asserted abstract
idea were considered.

'515 patents also build upon the pioneering scraping technology of the '077 patent.")) What the '535 and '515 patents claim to add is not simply the idea of summarizing past transaction information for some future predictive purpose or for a business purpose (as Plaid's proffered abstract ideas suggest), but rather the added value of having a categorization system that grows and improves in its ability to do its job, based on the consistent incorporation of new information. Indeed, in the portion of the specifications titled "Categorization of Collected and Summarized Information"—the only section of the patent that includes descriptions of preferred embodiments that differ from those previously referenced in the '077 patent—the focus is clearly on "further processing that might be done to add considerable value for the user." ('535 patent, col. 17:64-66) The specifications, as was noted above, go on to identify the "key ingredient" of the claimed system in this regard: "an ability to grow and improve the network categorization system." (*Id.*, col. 19:43-44; *see also* D.I. 15 at 23)

Unsurprisingly, reference to incorporation of this "key ingredient" is also found in the language of the claims. This is seen in the portion of the '535 patent, for example, that employs "a probability algorithm . . . in developing [certain] description characteristics" that are used in the process of categorizing transactions according to their purpose, *and* that requires that these "description characteristics are periodically amended according to further information that is collected and processed." ('535 patent, cols. 21:16-20, 22:7-10; *see also* Tr. at 104) It is also seen in the portion of the '515 patent that develops certain referenced expenditure categories used to parse and summarize transactions "from information taken from communication between users and the [claimed] system," that employs "a probability algorithm . . . in developing the expenditure categories," *and* that requires that these "expenditure categories are periodically

amended according to further information that is collected and processed." ('515 patent, cols. 21:17-22, 22:4-8; *see also* Tr. at 104)

That Plaid's asserted abstract idea fails to capture the key aspect of the categorization system—that it will "grow and improve"—can also be understood by examining the "19th century" analog to the asserted abstract idea that Plaid sets out in its briefing. (D.I. 12 at 17) There, Plaid notes that "a 19th century catalog could predict that a customer that purchases a saddle and stirrups does so for horse-riding and so is likely to buy reins. The notion that a service could forecast a customer's future desires using 'purchasing history' has 'existed for many centuries.'" (*Id.* (citations omitted)) Of course, in reading that passage, what jumps out first is the incongruity of asserting that a "catalog" or a "service" would be "predict[ing]" or "forecast[ing]" anything—what Plaid really means is that *human beings* who administer the catalog or service would have been playing that role. But that just begs the question—would those humans have been doing the predicting or forecasting in a similar way to the claimed computerized system here? And to that point, the proffered 19th century example of the asserted abstract idea does not appear to speak to how the catalog service would periodically amend their predicting or forecasting processes based on updated information—the asserted improvement that is called out by the patent specifications and referenced in the claims.

Thus, Plaid has failed to shoulder its burden of demonstrating that the claims at issue are directed to the abstract idea it has put forward. The Court thus recommends that Plaid's Motion be denied on that ground as to these claims.[38] *See Hedges*, 404 F.3d at 750.

---

[38]     Similarly, the abstract idea that Plaid referenced during oral argument—"summarizing transactions based on characteristics showing their purpose"—does not reflect, or otherwise suggest, the concept of a categorization system that is able "to grow and

c.   *Alice*'s step two

Having determined that Plaid failed to establish that the proposed representative claims are directed to the asserted abstract idea, the Court could end its analysis. But for the sake of completeness, the Court notes that even if Plaid had established that the claims were directed to the abstract idea it put forward, there are outstanding factual issues that would militate against granting Plaid's motion at this stage.

On this score, it is notable that in its *Markman* opinion, the District Court gave the terms "collection function" (found in claim 6 of the '535 patent) and "collector [software] function" (found in claim 7 of the '515 patent) the same meaning as the "software gathering agent" that was at issue in claim 7 of the '077 patent: "software component that uses a site-specific script and/or site-specific data to extract data values from an Internet site based on the site's logic and structure[.]" (D.I. 96 at 36-37)  And so, as with claim 7 of the '077 patent, there are at least viable disputes of material fact as to whether the utilization of this collecting function does more than perform "well-understood, routine, and conventional activities" commonly used in the relevant industry, or whether it would preempt a substantial number of systems that make use of the asserted abstract idea. (*See, e.g.*, D.I. 12 at 18 (Plaid arguing that the claims' collecting and compilation functions are akin to conventional data-gathering and data-analyzing steps called out in prior cases); D.I. 20 at 13 (same); D.I. 15 at 23, 25-27 (Yodlee arguing that the claims' collection function amounts to an inventive concept, and that it would not preempt a significant portion of the relevant field); D.I. 16, ex. C at 7 (patent applicant noting, in a response to the Examiner, that other different methods of collecting information from websites exist, such as

improve" based on new information.

where software is used that is coupled to a bank or financial institution, allowing the bank to download transactions to the software at the user's desktop); Tr. at 106)

So too are there material disputes as to the conventionality and preemptive effect of the claims' requirement that description characteristics and expenditure categories must be periodically amended according to further information that the system collects and processes. (*See, e.g.*, D.I. 12 at 18 (Plaid arguing that this requirement is not a "transformative limitation"); D.I. 20 at 12 (same); D.I. 15 at 23, 26-27 (Yodlee asserting that the claimed systems' ability to grow and improve the network categorization system "deals with a technological challenge[,]" amounts to more than "'purely conventional'" activity, and that it helps ensure that the claims do not preempt substantially all applications of the asserted abstract idea))

The existence of these factual and legal issues would preclude the Court from determining whether the claims contain "a limitation or combination of limitations that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon an ineligible concept itself[.]" *Versata Dev. Grp.*, 793 F.3d at 1332 (citation omitted). The Court thus concludes that, were claim 6 of the '535 patent and claim 7 of the '515 patent found to be directed to the asserted abstract idea, Plaid has failed to show that the claims could not plausibly incorporate an inventive concept. Thus, Plaid's Motion could also be denied without prejudice on this ground.

### 6.    The Remaining Claims

Plaid's Motion was directed to all claims of all seven asserted patents. The Court has determined that Plaid has not shown that the representative claims in the '077, '783, '535 and '515 parents are subject-matter ineligible under the *Alice* analysis. With respect to the claims in the

'451, '548 and '520 patents, the Court agrees that the proposed representative claims are subject-matter ineligible. Below the Court briefly addresses the remainder of the claims in the '451, '548 and '520 patents.

### a.    '451 patent

The Court above has found that claim 8 of the '451 patent does not recite a patent-eligible invention. As the Court understands that claim 8 is the only currently asserted claim as to this patent, it need not further address any other claims of the patent. (D.I. 152 at 1-2; D.I. 153, ex. E at 1)

### b.    '548 and '520 patents

The Court determined that claim 20 of the '548 patent and claim 21 of the '520 patent failed to claim patent-eligible subject matter. In its opening brief, Plaid provided very little in the way of analysis as to why other claims in these patents were subject-matter ineligible. (D.I. 12 at 16) For that reason, and because the Court understands that there can be no more than one asserted claim currently at issue with regard to these two patents (and indeed, that there may be no other asserted claims currently at issue as to the patents), (D.I. 152 at 1-3), the Court declines to make determinations about the eligibility of any other claims at this time. It thus recommends denial of the Motion as to any other claims in the patents.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that claim 8 of the '451 patent, claim 20 of the '548 patent, and claim 21 of the '520 patent are not eligible for patent protection under 35 U.S.C. § 101. Therefore, the Court recommends that Defendant's Motion be GRANTED as to those claims. The Court recommends that Defendant's Motion to Dismiss be DENIED as to the

remaining claims of the asserted patents as set out herein.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss

of the right to de novo review in the district court.  *See Henderson v. Carlson*, 812 F.2d 874, 878-

79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website,

located at http://www.ded.uscourts.gov.


Dated:  May 23, 2016

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE